Billy H. ASHBURN and Faye F. Ashburn, Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 83–7467.

United States Court of Appeals, Eleventh Circuit.

Aug. 28, 1984.

White on the $16,363 issue. On remand, any fees allowed for contesting this issue should be deducted from plaintiff's award.

Frank W. Donaldson, U.S. Atty., Caryl P. Privett, Asst. U.S. Atty., Birmingham, Ala., Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, Gilbert S. Rothenberg, Terry L. Fredricks, Tax Division, Dept. of Justice, Washington, D.C., for defendant-appellant.

Norman W. Harris, Decatur, Ala., for plaintiffs-appellees.

Before KRAVITCH and HATCHETT, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal by the defendant United States from a judgment entered by the United States District Court for the Northern District of Alabama awarding plaintiffs Billy H. Ashburn and Faye F. Ashburn $23,330.17 in attorneys' fees and other expenses under the Equal Access to Justice Act ("EAJA"). We hold that the plaintiffs are not entitled to attorneys' fees and other expenses. Therefore, we reverse.

## I. BACKGROUND

In April, 1975, Billy H. Ashburn ("Billy") and James C. Ashburn ("James"), who are brothers, owned approximately 30% and 70% respectively of the outstanding shares of stock in Pin Palace Lanes, Inc. ("Pin Palace"). Pin Palace, a Subchapter S corporation, owned and operated a bowling alley. The Ashburns decided to sell the business and assets of Pin Palace. To complete the sale, Billy established a trust for the benefit of his children, and James established a trust for the benefit of his children. Each appointed Central Bank of Alabama, N.A., ("Central Bank") as trustee. Billy and James then sold all of their stock in Pin Palace to the trusts for $870,-000.

After Central Bank acquired all of the stock of Pin Palace, the board of directors of Pin Palace decided to liquidate and dissolve the corporation under section 337 of the Internal Revenue Code of 1954 ("the Code"), which requires that the assets be sold or distributed within the period of one year. Immediately after the adoption of the plan of liquidation, all of the assets of Pin Palace were distributed proportionately to Central Bank, as trustee of the respective Ashburn trusts, with the exception of inventories of alcoholic beverages and

snack foods, which were sold prior to the distribution of assets to the trustee.

Central Bank then sold all of the assets (other than the cash) that the trusts had received for $900,000. Those assets consisted of .76 acre of land the trusts had acquired from Billy and James, 4.13 acres of real property previously owned by Pin Palace, a building and land improvements, and equipment that had been used in the bowling business.

Pin Palace notified the Internal Revenue Service ("the Service") that two trusts had acquired all of its stock. The Service wrote Pin Palace that its election to be treated as a Subchapter S corporation was terminated as of September 1, 1974.

On their 1975 individual income tax returns, Billy and James elected to report their gain on the sale of Pin Palace stock by the installment method of accounting authorized by section 453 of the Code. Consistent with this method, the Ashburns reported the gain attributable to each installment payment in the year in which the installment payment was received.

Pin Palace filed its corporate income tax return for the fiscal year ending on August 31, 1975. The return reflected tax liability of $24,909. The corporation did not report any of the gain or loss it realized on the disposition of its assets. Within twelve months of the date Pin Palace adopted the plan of liquidation, the corporation was dissolved in accordance with state law.

In 1977, the Service audited the Ashburns' 1975 federal income tax returns and Pin Palace's federal corporate income tax return. As a result of its examination, the Service issued deficiency notices against the Ashburns and against the two trusts, asserting three inconsistent positions.

The Service's primary position was that the sale of the Pin Palace stock to the two trusts should be disregarded for tax purposes. Consequently, the Service determined that Pin Palace's Subchapter S election had not terminated, that the Ashburns were required to include in their individual returns for 1975 the corporate income from operations and the section 1245 gain resulting from the sale of the machinery and equipment, and that all of the gain realized on the exchange of the stock for the corporate assets resulting from liquidation had to be recognized in the year of liquidation. The Service assessed deficiencies against Billy in the amount of $77,490.88 and against James in the amount of $252,223.43.

The Service's second position was to treat the transfer of the stock to the trusts as valid. As a consequence, it determined that the Subchapter S status of the corporation was terminated and that the sales of stock qualified for installment sale reporting. Under this alternative, however, it determined that Pin Palace had failed to report the section 1245 gain realized upon the sale of the machinery and equipment. Consequently, it issued deficiency notices to Central Bank, as trustee of the respective trusts, finding that the bank was liable for the taxes owed by Pin Palace as a result of having received the corporation's assets. Under the third position, the Service determined that the Ashburns were liable as transferees for the taxes Pin Palace failed to report.

To resolve the controversy, the Ashburns and the Service agreed that Billy would pay the assessment against him in the amount of $77,490.88, plus penalties and interest. Billy would then file a claim for refund, and upon its denial, bring suit for a refund. The parties further agreed that the entire controversy between Billy and James and the United States would be disposed of in accordance with the resolution of the refund suit filed by Billy.

Accordingly, Billy paid taxes, penalties, and interest of $106,604.62. Billy then filed a timely claim for refund for 1975 and after the lapse of six months without action on the part of the United States, filed suit on November 3, 1981 for refund of the entire amount paid. Once a complaint seeking a refund of taxes has been filed, the Service usually drafts a defense letter on the issues and forwards that letter, together with the relevant administrative

files, to the Justice Department attorney assigned to the case. In this case, however, the Service did not send the relevant administrative files to the Justice Department until April 29, 1982, almost six months after the complaint was filed. The United States filed its answer to the complaint on January 5, 1982, prior to receipt of the files, denying that the tax, penalty, and interest were illegally assessed or collected or that plaintiffs were entitled to a refund.

On September 29, 1982, five months after it received the files and shortly before a scheduled pretrial conference, government counsel informed the district court and opposing counsel that the government's case would likely be conceded and that there was no need for a pretrial conference. Counsel for the government then sought approval of the proposed concession by the Service and the Review Section of the Department of Justice. The Justice Department notified plaintiff's counsel of its approval forty days later on November 9, 1982.

Judgment was entered March 22, 1983 in favor of plaintiffs and against the United States for $104,879.62, which was the full amount sought reduced by a prior administrative refund made on one of the protective claims for refund. On April 19, 1983, plaintiffs filed an application seeking to recover $23,330.17 in attorneys' fees and other expenses from the United States under the EAJA. Following a hearing, the district court filed its opinion and order granting the plaintiffs' application in full.

## II. DISCUSSION

■ In reviewing the district court's decision to award fees under the EAJA, we reverse only if the district court has abused its discretion. *National Treasury Employees Union v. IRS,* 735 F.2d 1277, 1278 (11th Cir.1984); *United States v. 2,116 Boxes of Boned Beef,* 726 F.2d 1481,

1486 (10th Cir.1984); *Matthews v. United States,* 713 F.2d 677, 682 (11th Cir.1983); *Spencer v. NLRB,* 712 F.2d 539, 565 (D.C. Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984); *Hoang Ha v. Schweiker,* 707 F.2d 1104, 1105 (9th Cir.1983); *Knights of the Ku Klux Klan v. East Baton Rouge,* 679 F.2d 64, 68–69 (5th Cir. Unit A 1982). The EAJA provides:

> [A] court shall award to a prevailing party other than the United States fees and other expenses ... incurred by that party in any civil action ... brought by or against the United States in any court having jurisdiction of that action, *unless the court finds that the position of the United States was substantially justified* or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (emphasis added). The issue before us is whether the government's position was substantially justified within the meaning of the EAJA. If it was substantially justified, plaintiffs are not entitled to attorneys' fees. To resolve this issue, we must answer two questions: the meaning of "the position of the United States," and the meaning of "substantially justified," as used in section 2412(d)(1)(A) of the EAJA.

### A. *The Position of the United States*

■ The first issue is whether "the position of the United States" refers to the position taken by the government during litigation (the "litigation position" theory) or to the position taken by the agency on the underlying action before litigation (the "underlying action" theory).[1] The district court found that the "position of the United States" requires an examination of the underlying conduct of the agency before plaintiffs filed suit, and not merely an examination of the Department of Justice's conduct after plaintiffs filed suit.

The Eleventh Circuit has not previously considered this issue, and the courts that have considered this issue have split be-

---

1. We note that in most cases, the United States's litigation position will be the same as the agency's position on the underlying action. *Spencer v. NLRB,* 712 F.2d at 552. Under the facts of this case, however, in which the government concedes after the suit is filed, the United States's litigation position is not identical to the agency's position.

tween the "litigation position" theory[2] and the "underlying action" theory.[3] One problem is that the statute itself does not provide a clear answer as to which position we should adopt. *Rawlings v. Heckler,* 725 F.2d 1192, 1195 (9th Cir.1984); *Spencer v. NLRB,* 712 F.2d at 547–48; *Knights of the Ku Klux Klan v. East Baton Rouge,* 679 F.2d at 68; *Alspach v. District Director of Internal Revenue,* 527 F.Supp. 225, 228 (D.Md.1981). *Contra Natural Resources Defense Council, Inc. v. U.S. Environmental Protection Agency,* 703 F.2d 700, 707 (3d Cir.1983) (*"NRDC v. USEPA"*). In *NRDC,* the Third Circuit held that the Act's definition of "United States" clearly supports the underlying action theory. 703 F.2d at 707. Under the EAJA, " 'United States' includes *any agency and any official* of the United States acting in his or her official capacity." 28 U.S.C. § 2412(d)(2)(C) (emphasis added). We agree with the Third Circuit that this definition provides some support for the underlying action theory. This definitional provi-

sion is not conclusive, however, for as pointed out by Judge Hunter in his dissent in *NRDC,* the Act's definition of United States "merely recognizes the obvious— that the government as an entity can only take a 'position,' whatever the meaning of that term, through its agencies and the individuals who administer its agencies." 703 F.2d at 718 n. 2. *Accord Spencer v. NLRB,* 712 F.2d at 547.

Section 2412(d)(3) of the EAJA does not apply to our case, but as pointed out by the court in *Spencer v. NLRB,* 712 F.2d at 547–48, it provides some support for the litigation position theory. Under section 2412(d)(3), a court may award attorneys' fees incurred as a result of a hearing before an administrative agency. Section 2412(d)(3) directs the court to award attorneys' fees "to a prevailing party ... unless the court finds that *during such adversary adjudication* the position of the United States was substantially justified...." 28 U.S.C. § 2412(d)(3) (emphasis added).[4]

**2.** See *Environmental Defense Fund, Inc. v. EPA,* 716 F.2d 915, 920 (D.C.Cir.1983); *Spencer v. NLRB,* 712 F.2d at 557; *Ellis v. United States,* 711 F.2d 1571, 1575, (Fed.Cir.1983); *Kay Mfg. Co. v. United States,* 699 F.2d 1376, 1379 (Fed.Cir.1983); *Gava v. United States,* 699 F.2d 1367, 1370 (Fed. Cir.1983); *Tyler Business Servs. v. NLRB,* 695 F.2d 73, 75 (4th Cir.1982); *Broad Ave. Laundry & Tailoring v. United States,* 693 F.2d 1387, 1390 (Fed.Cir.1982); *Grand Boulevard Improvements Ass'n v. City of Chicago,* 553 F.Supp. 1154, 1162–63 (N.D.Ill.1982); *Lauritzen v. Secretary of the Navy,* 546 F.Supp. 1221, 1226 & n. 6 (C.D.Cal. 1982); *Operating Eng'rs Local Union No. 3 v. Bohn,* 541 F.Supp. 486, 495–96 (D.Utah 1982); *Berman v. Schweiker,* 531 F.Supp. 1149, 1154 (N.D.Ill.1982), *aff'd,* 713 F.2d 1290 (7th Cir. 1983); *Alspach v. District Director of Internal Revenue,* 527 F.Supp. 225, 228 (D.Md.1981).

**3.** See *Rawlings v. Heckler,* 725 F.2d at 1195; *Natural Resources Defense Council, Inc. v. U.S. Environmental Protection Agency,* 703 F.2d 700, 707 (3d Cir.1983); *Environmental Defense Fund v. Watt,* 554 F.Supp. 36, 40–41 (E.D.N.Y.1982); *MacDonald v. Schweiker,* 553 F.Supp. 536, 540–41 (E.D.N.Y.1982); *Globe, Inc. v. United States,* 553 F.Supp. 7, 9 (D.D.C.1982); *Moholland v. Schweiker,* 546 F.Supp. 383, 386 (D.N.H.1982); *Nunes-Correia v. Haig,* 543 F.Supp. 812, 816 (D.D.C.1982); *Citizens Coalition for Block Grant Compliance v. City of Euclid,* 537 F.Supp. 422, 426 (N.D.Ohio 1982), *aff'd,* 717 F.2d 964 (6th Cir.1983); *Costantino v. United States,* 536

F.Supp. 60, 61 (E.D.Pa.1982); *Wolverton v. Schweiker,* 533 F.Supp. 420, 425 (D.Idaho 1982); *Photo Data, Inc. v. Sawyer,* 533 F.Supp. 348, 352 (D.D.C.1982).

**4.** Specifically, under § 2412(d)(3), the court is to include in the award "fees and other expenses to the same extent authorized in" 5 U.S.C. § 504(a), which provides:

(1) An agency that conducts an adversary adjudication shall award, to a prevailing party, other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency *as a party to the proceeding* was substantially justified or that special circumstances make an award unjust.

(emphasis added). This provision appears to take for granted that "the position of the United States" in the administrative context, is its litigation position. *See Spencer v. NLRB,* 712 F.2d at 547 n. 31.

Furthermore, the legislative history indicates that the standard which is applied in adversary adjudications under § 504(a) also applies to the awards in civil actions under § 2412(d)(1)(A). H.R.Rep. No. 1418, 96th Cong., 2d Sess. 13 (1980), U.S.Code Cong. & Admin.News 1980, 4953. Because the standard of § 504 applies to § 2412(d)(1)(A), the legislative history of § 504 becomes relevant to our case. According to the House Report's section-by-section analysis of

Thus, the provision adopts the litigation position theory, for it presumes that the government's "position" for the purposes of assessing its liability for attorneys' fees resulting from the administrative adjudication is the stance it adopted *during* litigation, not the stance it adopted *prior* to litigation. Of course, Congress could have intended that the phrase "position of the United States" have a different meaning in section 2412(d)(3) than in the provision relevant to this case, section 2412(d)(1)(A). But since Congress did not indicate otherwise, the use of the identical phrase—"the position of the United States"—in sections 2412(d)(3) and 2412(d)(1)(A), suggests that the phrases should be interpreted similarly.[5]

Thus, on balance, the language of the Act provides more support for the litigation position theory than the underlying action theory. We note, however, that the language of the statute is far from decisive.

Next we will consider the legislative history of the Act. Unfortunately, it does not provide a conclusive answer. *Spencer v. NLRB*, 712 F.2d at 548–49. *Contra NRDC v. USEPA*, 703 F.2d at 707–12 (legislative history establishes beyond a question that Congress intended underlying action theory to apply). On the one hand, language in both committee reports suggests that Congress was concerned with irresponsible governmental positions in litigation:

A court should look closely at cases, for example, where there has been a judgment on the pleadings or where there is a directed verdict or where a prior suit on the same claim had been dismissed.

Such cases clearly raise the possibility that the Government was unreasonable *in pursuing the litigation.*

The standard, however, should not be read to raise a presumption that the Government position was not substantially justified, simply because it lost the case. Nor, in fact, does the standard require the government to establish that *its decision to litigate* was based on a substantial probability of prevailing.

H.R.Rep. No. 1418, 96th Cong., 2d Sess. 11 (1980), U.S.Code Cong. & Admin.News 1980, 4989; S.Rep. No. 253, 96th Cong., 1st Sess. 6–7 (1979) (emphasis added). Both reports conclude that the EAJA will allow a decision whether to contest governmental behavior "to be based on the merits of the case rather than the cost of litigating," thus emphasizing that it is the *litigation* costs that will be reimbursed, not the agency costs.

On the other hand, the legislative history contains statements that support the underlying action theory. In discussing the burden of proof under the Act, the House and Senate Reports note "that it is far easier for the Government, *which has control of the evidence, to prove the reasonableness of its action....*" H.R.Rep. No. 1418 at 11, U.S.Code Cong. & Admin.News 1980, p. 4989; S.Rep. No. 253 at 6. According to the majority in *NRDC*, the reference to the government having control of the evidence implies that the agency's actions must be examined for reasonableness. *NRDC v. USEPA*, 703 F.2d at 707. Moreover, the conclusions of both House and Senate reports may provide further support by declaring that an award of reason-

the Act, § 504's "effect is to place the burden on the government to make a positive showing that its position and actions *during the course of the proceedings* were substantially justified...." H.R.Rep. No. 1418 at 13, U.S.Code Cong. & Admin.News 1980, at 4992 (emphasis added). This language indicates that the government's post-complaint conduct should be considered. *See NRDC v. USEPA*, 703 F.2d at 720 (Hunter, J., dissenting).

5. There is some additional support in the language of the Act that the litigation position theory should be adopted. Section 2412(d)(1)(C) authorizes a court, "in its discre-

tion," to "reduce the amount to be awarded pursuant to this subsection, or deny an award, to the extent that the prevailing party during the course of the proceedings engaged in conduct which unduly and unreasonably protracted the final resolution of the matter in controversy." The District of Columbia Circuit observed that "[t]he linkage thus established between the size of the award and the *private party's* behavior in litigation is at least consistent with an assumption that the predicate for an award is the *government's* unreasonable behavior in litigation." *Spencer v. NLRB*, 712 F.2d at 548 n. 33.

able fees and expenses is allowed against the Government "when its *action* is not substantially justified." H.R.Rep. No. 1418 at 12, U.S.Code Cong. & Admin.News 1980, p. 4991; S.Rep. No. 253 at 7 (emphasis added). The use of the word "action" may indicate a reference to the agency's underlying action, not to the government's litigation position. In addition, in the floor debates, supporters and critics of the bill expressed their belief that the bill would regulate arbitrary and unreasonable governmental *action. See, e.g.,* 125 Cong. Rec. S10922 (daily ed. July 31, 1979) (statement of Sen. Nelson); *id.* at S10933 (statement of Sen. Kennedy); *id.* at S10914, 10917 (statement of Sen. DeConcini); *id.* at S10915 (statement of Sen. Dole); *id.* (statement of Sen. Stevens); *id.* at S10920 (statement of Sen. Thurmond); *id.* at S10921 (statement of Sen. McClure). *See also* H.R.Rep. No. 1418 at 10 ("there is evidence that small businesses are the target of agency action precisely because they do not have the resources to fully litigate the issue"). We conclude, however, that the use of the word "action" in the legislative history does not make clear that we are to look to the agency's conduct.

To resolve this issue, we must examine the broad purposes of the EAJA. The goal of the Act is to encourage private parties, who might be deterred by the expense of litigation, to challenge unreasonable governmental behavior. The premise of the bill is that private parties who litigate an issue against the government are not only representing their own interests, but are also serving the public by defining the limits of federal authority. Thus, Congress believed that it would be unfair to require private parties, who are serving a public purpose, to bear all the costs. Additionally, since the United States has greater resources and expertise than a private litigant, Congress determined that it should be subject to a different standard for paying attorneys' fees. H.R.Rep. No. 1418 at 5–6, 9–10, 12; S.Rep. No. 253 at 1, 5–7. Thus, the Act rejects the traditional "American rule" that attorneys' fees are not

awarded unless the suit was prosecuted in bad faith. H.R.Rep. No. 1418 at 8–10, S.Rep. No. 253 at 3–5.

The EAJA, however, does not adopt the position that the government should compensate all prevailing parties. Congress did not wish to inhibit the government's legitimate efforts to enforce the law, S.Rep. No. 253 at 6; nor did it wish to impose the potentially high cost of an automatic fee-shifting position on the government. H.Rep. No. 1416 at 6. *See also Spencer v. NLRB,* 712 F.2d at 550–51. Instead, the Act provides for a compromise embodied in the standard of "substantial justification": "This standard balances the constitutional obligation of the executive branch to see that the laws are faithfully executed against the public interest in encouraging parties to vindicate their rights." H.Rep. No. 1418 at 10; S.Rep. No. 253 at 6.

We hold that interpreting "position" as the government's litigation position best implements the legislative compromise embodied in the EAJA. Any other holding could result in an automatic fee award to plaintiffs in many cases. *Spencer v. NLRB,* 712 F.2d at 552; *NRDC v. USEPA,* 703 F.2d at 719 (Hunter, J., dissenting); *Operating Engineers Local Union No. 3 v. Bohn,* 541 F.Supp. at 495. For example, a court reviewing agency action must examine whether there was substantial evidence to support the agency decision or whether the action was arbitrary and capricious. *See* 5 U.S.C. § 706. After the court had concluded that the agency's action was arbitrary and capricious, and the prevailing party asked for attorney's fees, it would be hard for the court to then rule that the agency's action was nevertheless "substantially justified." *Spencer v. NLRB,* 712 F.2d at 52; *NRDC v. USEPA,* 703 F.2d at 719 (Hunter, J., dissenting); *Operating Engineers Local Union No. 3 v. Bohn,* 541 F.Supp. at 495.

Four out of six circuits that have expressly decided this issue have held that a court must look solely to the litigation posi-

tion of the United States [6]. *See United States v. 2,116 Boxes of Boned Beef,* 726 F.2d at 1487; *Environmental Defense Fund, Inc. v. EPA,* 716 F.2d 915, 920 (D.C.Cir. 1983); *Spencer v. NLRB,* 712 F.2d at 557; *Ellis v. United States,* 711 F.2d 1571, 1575 (Fed.Cir.1983); *Gava v. United States,* 699 F.2d 1367, 1370 (Fed.Cir.1983); *Tyler Business Services, Inc. v. NLRB,* 695 F.2d 73, 75 (4th Cir.1982); *Broad Avenue Laundry & Tailoring v. United States,* 693 F.2d 1387, 1390 (Fed.Cir.1982). *But see Rawlings v. Heckler,* 725 F.2d 1192 (9th Cir. 1984); *NRDC v. USEPA,* 703 F.2d at 707. *See also Foley Construction Co. v. United States Army Corps of Engineers,* 716 F.2d 1202, 1204 (8th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984); *Berman v. Schweiker,* 531 F.Supp. 1149, 1154 (N.D.Ill.1982), *aff'd,* 713 F.2d 1290 (7th Cir.1983), all of which looked to the litigation position of the government as opposed to the agency's underlying action. Thus, we conclude that "the position of the United States" refers to the government's litigation position, not the underlying action by the agency.

### B. *Was the Government's Position Substantially Justified?*

■ We must now determine whether the government's litigation position in this case was "substantially justified." The government bears the burden of showing that its position was substantially justified. H.R.Rep. No. 1418 at 10; S.Rep. No. 253 at 6. *See also Enerhaul, Inc. v. NLRB,* 710 F.2d 748, 750 (11th Cir.1983); *S & H Riggers & Erectors, Inc. v. OSHRC,* 672 F.2d at 430. The standard is one of reasonableness; the government must show "that its

case had a reasonable basis both in law and fact." H.R.Rep. No. 1418 at 10, U.S.Code Cong. & Admin.News 1980, at 4989; S.Rep. No. 253 at 6. *See also Matthews v. United States,* 713 F.2d 677, 683 (11th Cir.1983). The fact that the government lost its case does not raise a presumption that the government's position was not substantially justified. H.R.Rep. No. 1418 at 11; S.Rep. No. 253 at 7. Nor is the government required to establish that its decision to litigate was based on a substantial probability of prevailing. H.R.Rep. No. 1418 at 11; S.Rep. No. 253 at 7.

Here, the government conceded the case before it went to trial. The district court, which considered both the agency's underlying action and the government's litigation position, concluded that the government's litigation position was not substantially justified because the government did not concede until almost eleven months after the plaintiffs filed their complaint.

■ We hold that the district court's judgment was an abuse of discretion. The government should not be compelled to decide immediately upon service of the complaint whether to concede or pursue the case. The Justice Department is entitled to the time reasonably necessary to receive and review the Service's files. If the Justice Department had waited years to concede, or if the issues involved were routine and clear cut, the outcome of the case might be different. But here, the Justice Department waited five months after it had received the files before conceding. The issues involved in the controversy were not simple. We hold that this conduct was reasonable and thus, was "substantially justified."

---

**6.** The government argues that in *S & H Riggers & Erectors, Inc. v. OSHRC,* 672 F.2d 426 (5th Cir. Unit B 1982), the former Fifth Circuit indicated that the court should look solely to the government's litigation position. We note that decisions rendered after September 30, 1981, by a Unit B court of the former Fifth Circuit are binding precedent in this Circuit. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir. 1982). Although other courts have interpreted

the *S & H Riggers* decision as adopting the litigation position theory, *see e.g., United States v. 2,116 Boxes of Boned Beef,* 726 F.2d at 1487; *Spencer v. NLRB,* 712 F.2d at 546 n. 28; *NRDC v. USEPA,* 703 F.2d at 706; *Environmental Defense Fund, Inc. v. Watt,* 554 F.Supp. 36, 38, 40 (E.D.N.Y.1982); *MacDonald v. Schweiker,* 553 F.Supp. 536, 540 (E.D.N.Y.1982), we conclude that the *S & H Riggers* court did not reach this issue.

A similar result was reached in *Alspach v. District Director of Internal Revenue,* 527 F.Supp. 225 (D.Md.1981). In *Alspach,* the government filed an answer generally denying the taxpayers' claims before it had received and reviewed the Service's files. One month after it received the Service's files, the government advised plaintiffs that the government would concede the case. Noting that the government "acted fairly expeditiously when the facts became known to counsel," the court held that the government had met its burden of showing substantial justification for initially contesting the action. *Id.* at 229.[7] *See also White v. United States,* 740 F.2d 836, 842 (11th Cir.1984) (government was substantially justified in conceding issue less than three months after plaintiff raised it in her amended complaint).

We also find it significant that during the eleven months delay between the time plaintiffs filed their complaint and the time the government conceded, the case was completely inactive. Plaintiffs' attorneys spent only 2.2 hours on the case during this time. Furthermore, plaintiffs were not harmed by this delay in receiving their refund because they are entitled to interest. *See* 26 U.S.C. § 6611. Therefore, we conclude that plaintiffs are not entitled to attorneys' fees under the EAJA.

## III.  CONCLUSION

Because of our disposition of the government's first argument, it is not necessary to decide the other issues raised by the government on appeal.[8] The district court award of $23,330.17 in attorneys' fees and other expenses to plaintiffs is REVERSED.

---

**7.** *But see Spencer v. NLRB,* 712 F.2d 539, 555 n. 58 (D.C.Cir.1983) (dicta) (if the government does not immediately accede to the plaintiff's demand, but instead initially opposes his claims and then at some later date surrenders, the government is liable for attorney's fees, both because it acted unreasonably and because it briefly adopted a litigation position lacking substantial justification).

**8.** The government also argued that: (1) the Service's administrative position was "substantially justified"; (2) the EAJA does not permit the award of any legal fees incurred in connection with plaintiffs' administrative proceedings before the Service; and (3) the award of legal fees was excessive and unreasonable.