Laurence G. **RUSSELL**, William L. Hanna and Eddie D. Langwell, Plaintiffs-Appellants,

v.

**NATIONAL MEDIATION BOARD**, Defendant-Appellee.

No. 84–1345.

United States Court of Appeals, Fifth Circuit.

June 28, 1985.

Robert F. Gore, Rex H. Reed, Nat'l Right to Work Legal Defense Foundation, Inc., Springfield, Va., John Cosmic, Amarillo, Tex., for plaintiffs-appellants.

Mark W. Pennak, William Kanter, Dept. of Justice, Civil Div., Washington, D.C., for Nat. Mediation Bd.

Before THORNBERRY, REAVLEY and HIGGINBOTHAM, Circuit Judges.

THORNBERRY, Circuit Judge:

Appellants Laurence G. Russell, et al. won their action against the National Mediation Board (the "Board") on their prior appeal to this court. They now appeal the district court's refusal to award them attorney's fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)(1)(A). We affirm the district court's denial of attorney's fees, holding that although the appellants timely filed their application for fees, a fee award is inappropriate because the Board's position in the litigation was substantially justified within the meaning of subsection (d)(1)(A) of the EAJA.

## FACTS AND PROCEDURAL HISTORY

This case is before the Fifth Circuit for the second time. In *Russell v. National Mediation Board,* 714 F.2d 1332 (5th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984), another panel of this court decided the merits of the case in the appellants' favor. The appellants subsequently applied to the district court for attorney's fees under subsection (d)(1)(A) of the EAJA. They now appeal the district court's denial of their application.

We are faced here with two difficult and unsettled questions of statutory interpretation. First, in order to evaluate whether the appellants timely filed their application for attorney's fees, we must determine precisely the meaning of the phrase "final judgment in the action" as it appears in subsection (d)(1)(B):

> A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses ...

28 U.S.C. § 2412(d)(1)(B). Second, if we find that the application for fees was timely, we must then determine whether "position of the United States," as that phrase appears in subsection (d)(1)(A), refers to the government's position in the underlying action or its position in the litigation. Subsection (d)(1)(A) provides in pertinent part:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and expenses ... incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, *unless the court finds that the position of the United States was substantially justified* or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (emphasis ours). Before addressing these issues of statutory interpretation, however, it is appropriate to describe more fully the facts and procedural history of the case.

In 1943 the police officers and special agents below the rank of captain on the Santa Fe Railroad elected to be represented under the Railway Labor Act by the National Council of Railway Patrolmen's Union, AFL. The Railway Patrolmen's Union was later replaced as representative by its successor in interest, the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees (BRAC). The police officers became dissatisfied with BRAC, and in 1980 some of them decided that they no longer wanted union representation. Accordingly, they gathered 113 authorization cards from the 210 member unit and designated Russell as their representative "for all purposes under the Railway Labor Act."

Russell then filed with the Board an "Application for Investigation of Representational Dispute." He requested that the Board certify him as the police officers' authorized representative in accordance with the Railway Labor Act. BRAC objected to Russell's application on the grounds that it constituted a petition for decertification since Russell had no intention to act as the representative of the police officers. The Board agreed and dismissed Russell's application, stating:

> The Railway Labor Act, unlike the National Labor Relations Act, contains no statutory provision for decertification of a bargaining representative [citations]. The Board will not progress an application for investigation of a representation dispute where the applicant lacks the intent to represent the craft or class, if certified, [citation] and will dismiss such an application because it is void *ab initio.*

Russell and the other appellants filed suit in federal district court in July 1981. They sought a declaration that the Board's action was unlawful, arbitrary, capricious, and an abuse of discretion. They also sought a writ of mandamus to compel the Board to hold a representational election. Finally, they sought an injunction against BRAC and Santa Fe to suspend the requirement of membership in BRAC as a prerequisite to employment with Santa Fe. The district court granted the Board's motion for summary judgment, holding that "[i]t is well established that the Board's decisions regarding representational disputes, made pursuant to Section 2, Ninth, of the Railway Labor Act, are not subject to judicial review." The district court noted two narrow exceptions to this general rule, but found that neither applied.

On the appellants' original appeal, this court, through Judge Jolly, held that while judicial review of the Board's decisions is indeed limited, jurisdiction was present. 714 F.2d 1332. The court then reversed and remanded to the district court with instructions that it direct the Board to process Russell's application. Although Judge Jolly noted at the outset of his opinion that the case was one of first impression, he went on to state that certain of the Board's positions were Orwellian and Kafkaesque, *Id.* at 1342 n. 11–12, and that the Board had breached a "clear statutory mandate" to process Russell's application. *Id.* at 1341.

The court of appeals entered its decision on September 22, 1983. On November 10, 1983, BRAC filed a suggestion for rehearing en banc.[1] Treating it as a petition for a panel rehearing as well as a suggestion for rehearing en banc, the court denied both on November 28, 1983. On February 24, 1984, BRAC filed a petition for writ of certiorari, which the Supreme Court denied on May 21, 1984. *Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees v. Russell,* —— U.S. ——, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984). Although the Board twice requested and received extensions of time to file a petition for rehearing, it did

---

1. The court had granted BRAC's motion to extend the time for filing a suggestion for rehearing en banc, and BRAC timely filed by the extended deadline.

not avail itself of the opportunity. Nor did it petition for writ of certiorari.

On February 7, 1984, the appellants filed their application for attorney's fees in the district court. In denying the application the court held that although the appellants were prevailing parties and met the financial eligibility requirements of the EAJA, they were not entitled to attorney's fees because the Board's position was substantially justified. The court also held that an award of fees would be unjust in light of the "special circumstance" that the case on the merits was one of first impression. *See* 28 U.S.C. § 2412(d)(1)(A).

On appeal the appellants challenge the district court's conclusion that the Board's position was substantially justified. While they concede that the Board's *litigation* position was substantially justified, they contend that under subsection (d)(1)(A) we should look to the position that the Board took in the underlying action (i.e., the refusal to process Russell's application for investigation of a representation dispute) and that that position was not substantially justified. The appellants also challenge the district court's conclusion that special circumstances would make a fee award unjust.

In its appellate brief the Board contends for the first time that the appellants' application for fees was untimely and that the district court and this court therefore lack jurisdiction to consider it. Because this issue calls our subject matter jurisdiction into question, we will address it first. However, some background concerning the EAJA may prove a useful prelude.

### I. The Equal Access to Justice Act

On October 1, 1981, Congress enacted the EAJA with the broad purpose of awarding private litigants the expenses of seeking review of or defending against unreasonable government action. *United States v. 329.73 Acres, Grenada and Yalobusha Ctys.*, 704 F.2d 800, 801 (5th Cir. 1983, *en banc*). Through enactment of the EAJA Congress intended to encourage litigants of limited means to vindicate their rights by challenging regulations or agency actions that they would otherwise comply with in order to avoid paying the costs of litigation. *Id.* at 802. As Congress stated:

> It is the purpose of this title ... to diminish the deterrent effect of seeking review of, or defending against, governmental action by providing in specified situations an award of attorney fees, expert witness fees, and other costs against the United States.

EAJA § 202(a), Public L. 96–481, tit. 2, 94 Stat. 2325 (1980). By raising the spectre of adverse judgments for attorney's fees and costs, Congress also intended to provide government agencies an incentive to avoid taking unjustified positions or actions. 704 F.2d at 802.

Congress included an automatic sunset provision by which subsection 2412(d) expired on October 1, 1984. Nevertheless, the subsection continues to apply to any action commenced before that date. EAJA, *supra*, § 204(c), 94 Stat. at 2325.

During 1984 Congress sought to re-enact the EAJA with certain amendments pertaining to subsections (d)(1)(A) and (B), the provisions upon which the resolution of this appeal depends. With regard to subsection (d)(1)(B), which provides that a fee application must be filed "within 30 days of final judgment in the action," Congress sought to clarify "final judgment" by specifically defining that term to mean a judgment that is final and not appealable. The Senate Report explained:

> The question arises as to whether a 'final judgment' occurs when the court enters an appealable order or when a party's right to appeal that order has lapsed. This issue is important since the thirty-day deadline for filing the fee application is jurisdictional and cannot be waived.
>
> The Committee believes that the interpretation of the court in *McDonald v. Schweiker*, 726 F.2d 311 (7th Cir.1983), regarding this issue is the correct one.... The EAJA allows a prevailing party to file a fee petition within 30 days of the final disposition of a case on the

merits i.e. when a party's right to appeal the order has lapsed.

S. 919, S.Rep. No. 98–586, 98th Cong., 2d Sess. 16 (1984).

With respect to subsection (d)(1)(A) of the EAJA, which provides for an award of fees "unless the court finds that the position of the United States was substantially justified," Congress attempted to amend the statute to provide:

> 'position of the United States' includes the underlying action which led to the litigation; except that fees and expenses may not be awarded to a party for any portion of the litigation in which the party has unreasonably protracted the proceedings.

H.R. 5479, 98th Cong., 2d Sess. (1984).

The President, however, vetoed Congress' proposed re-enactment of the EAJA. In his Memorandum of Disapproval he stated that although he remained firmly committed to the re-enactment of the EAJA, he was of the opinion that certain of Congress' amendments to the Act "do not further the Act's basic purposes and ... are inconsistent with fundamental principles of good government." 42 Cong.Q.Weekly Ref. 2964 (1984). The President's most strenuous objection was to Congress' amending the EAJA to define "position of the United States" to include the government's underlying action position. He contended that such a change would result in needless and wasteful litigation and would "undermine the free exchange of ideas and positions within each agency that is essential for good government." The President did not comment on Congress' new definition of "final judgment."

Despite the President's veto, some courts, in interpreting the provisions of the original EAJA, have accorded great weight to Congress' proposed bill and its legislative history.[2] We are of the opinion, however, that "[i]n evaluating the weight to be attached to these statements, we begin with the oft-repeated warning that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Consumer Product Safety Com'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 117–118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980) (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960)). Subsequent legislative history is at best tertiary authority to be considered only after the language of the statute and its pre-enactment legislative history, and then only with great trepidation. *Id.* 447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n. 13. This cautious approach to legislative interpretation was recently followed by the 8th Circuit sitting en banc in another EAJA case:

> The issue here is the intent of the 96th Congress regarding section 2412(b) [citation], and the current report [of the House Committee on the Judiciary] sheds no light on that intent. *See* Dickerson, *Statutory Interpretation: Dipping into Legislative History,* 11 Hofstra L.Rev. 1125, 1146 (1983).... President Reagan's refusal to sign H.R. 5479, the bill that the report accompanied, deprives this statement of authoritative content. [citation] We need not give weight to the reports of congressional committees on bills that do not become law.

*Premachandra v. Mitts,* 753 F.2d 635, 642 n. 9 (8th Cir.1985, *en banc*). We are inclined to follow the 8th Circuit's reasoning and in this case accord little or no weight to the postenactment legislative history of the EAJA.

## II. Timeliness

Subsection 2412(d)(1)(B) provides that a prevailing party must file his application

---

**2.** In *Taylor v. United States,* 749 F.2d 171, 174 (3d Cir.1984), for example, the Third Circuit held:

> The President's pocket veto renders the bill to re-enact the EAJA without legal effect, but we find the language of the bill and its legislative history persuasive as a clear expression of congressional intent.

Similarly, in *Clifton v. Heckler,* 755 F.2d 1138, 1145 n. 15 (5th Cir.1985), another panel of this court stated that "[R]egardless of the President's veto of the bill ... we find its legislative history instructive on the question of the intended nature of the thirty-day limitation under the original EAJA."

for attorney's fees "within thirty days of final judgment in the action." The Board contends for the first time on appeal that the appellants failed to meet this requirement and that this court therefore lacks jurisdiction to consider the application for fees. The appellants' first response is that the Board waived this argument by not presenting it in the district court. We disagree. Another panel of this court recently reiterated the well-established principle that a failure to timely file a fee application under the EAJA deprives the court of subject matter jurisdiction:

> Because the EAJA represents a waiver of the Federal government's immunity from suits for attorney's fees and because a waiver of sovereign immunity must be strictly construed, we hold that the statutory time limitation, as an integral condition of the sovereign's consent to be sued, is a jurisdictional prerequisite to an award of attorney's fees under the EAJA.

*Clifton v. Heckler*, 755 F.2d 1138, 1144 (5th Cir.1985); *see also Action on Smoking & Health v. Civil Aeronautics Board*, 724 F.2d 211, 225–26 (D.C.Cir.1984). Because the issue affects our jurisdiction to hear this appeal, we are compelled to consider the timeliness of the appellants' fee application.

■ The question we must answer then is whether under subsection (d)(1)(B) of the EAJA an application for fees is timely as filed "within thirty days of final judgment in the action" where it is filed more than thirty days after the court of appeals entered its decision in the case, but less than thirty days after the government's time to petition for writ of certiorari has lapsed. Unfortunately, there is a split of authority as to what "final judgment" means for the purposes of subsection (d)(1)(B). The Ninth Circuit has held that "final judgment" should be defined by its common usage in contexts such as 28 U.S.C. § 1291, Fed.R.App.P. 4(a), and Fed.R.Civ.P. 54, and therefore means an appealable judgment of the district court. *McQuiston v. Marsh*, 707 F.2d 1082, 1085 (9th Cir.1983). In *McDonald v. Schweiker*, 726 F.2d 311, 315

(7th Cir.1983), however, the Seventh Circuit rejected the Ninth Circuit's analysis and held that "final judgment" means "after the judgment in the district court has become final and unappealable, or after the court of appeals or the Supreme Court has entered a final judgment." The majority of courts that have addressed the issue have adopted the Seventh Circuit's analysis, *see, e.g., Massachusetts Union of Public Housing Tenants, Inc. v. Pierce*, 755 F.2d 177 (D.C.Cir.1985); *Taylor v. United States*, 749 F.2d 171 (3d Cir.1984), and in the past we have at least tacitly accepted a similar position. *See United States v. 329.-73 Acres, Grenada and Yalobusha Ctys.*, 704 F.2d 800, 810–11 (5th Cir.1983, *en banc*). Because we are convinced that the Seventh Circuit's definition of "final judgment" promotes the efficacious application of subsection (d) and is most consistent with the purposes of the EAJA, we now join the increasing number of courts that have expressly adopted that definition.

In *McQuiston v. Marsh*, McQuiston applied for fees under subsection (d) almost three months after the district court entered its judgment. 707 F.2d at 1084. The district court denied McQuiston's application as untimely. On appeal the Ninth Circuit upheld the district court's judgment as to subsection (d), stating:

> We reject McQuiston's contention that the 30-day requirement of subsection (d) means that an application must be filed within 30 days of the expiration of the time to appeal or within 30 days of the terminating action in the court of last resort. [citation]
>
> Rather, 'final judgment' should be defined by its common usage in contexts such as 28 U.S.C. § 1291, Fed.R.App.P. 4(a), and Fed.R.Civ.P. 54. Therefore, a request for attorney's fees under subsection (d) is untimely if filed more than 30 days after the district court has entered judgment.

*Id.* at 1085.

The Seventh Circuit in *McDonald* rejected the Ninth Circuit's analysis. 726 F.2d

311 (1983). *McDonald* was an action for judicial review of the final decision of the Secretary of Health and Human Services as to when McDonald first became entitled to old-age insurance benefits. The district court awarded McDonald summary judgment against the government on October 5, 1981. On December 2 the government timely filed its notice of appeal to the Seventh Circuit. However, on March 24, 1982, the government moved to dismiss its appeal, and it was so dismissed on March 30. On April 29 McDonald applied to the district court for attorney's fees and costs under subsection (d). The district court awarded her fees and costs and the government appealed. The court of appeals stated the issue on appeal as "whether an application for [attorney's fees under subsection (d)] is untimely if filed more than 30 days after the district court renders its final judgment, although less than 30 days after any appellate proceeding are completed." *Id.* at 312.

At the outset of its opinion the court noted that the term "final judgment" does not have a single fixed meaning. *Id.* at 313. It distinguished the "final judgment" that disposes of the plaintiff's claim in district court (as in Fed.R.Civ.P. 54(b) or 28 U.S.C. § 1291) from that which "writes finis to the entire litigation" (as in Clayton Act, § 5(a), 15 U.S.C. § 16(a)). *Id.* The court explained that

> [w]here the purpose of a statute or rule is to indicate what orders are appealable ... finality must refer to the pre-appellate proceedings. But in a statute such as 46 U.S.C. § 748, which defines the circumstances under which the United States will pay admiralty claims, 'final judgment' must mean final after all appeals, for one cannot imagine the government being willing to pay before then....

*Id.*

The court found, and we agree, that the legislative history of subsection (d) sheds

no light on which "final judgment" Congress had intended. It then examined the practical consequences of administering the EAJA under the government's definition of "final judgment"—that "final judgment" refers merely to an appealable judgment rather than an unappealable one. One such consequence, the court reasoned, would be that applicants would suffer the expense and inconvenience of being required to file fee applications at each stage of litigation. We find this a particularly compelling reason for adopting the Seventh Circuit's view. Because a litigant is entitled to fees expended at every stage of the litigation, a requirement that fees must be filed within thirty days of an appealable order would result in multiple fee litigation, thus unnecessarily burdening the courts and the litigants.

Nonetheless, the Board argues that due to the small likelihood of Supreme Court review in most cases, we should not delay the thirty-day deadline by the time allowed for petitioning for certiorari. To the contrary, in providing for a single fee litigation at the end of all proceedings we are weighing the added convenience of allowing parties to file for and presumably receive fees at each level of litigation [3] against the inconvenience of multiple fee litigation. Clearly, that Supreme Court review is rarely sought and even more rarely granted makes waiting for the expiration of the time to petition for certiorari all the more sensible; the inconvenience to the litigant of waiting ninety or so days is small compared to the potential inconvenience of multiple fee litigation.

The *McDonald* court also noted that

> to force the claimant to put in his fee application within 30 days of the filing of the final judgment in the district court, which is to say before the government need file its notice of appeal, delivers into the hands of the government a potent, acknowledged, and from the standpoint of the policy of the Equal Access to

---

**3.** This may actually be of no weight in that the Seventh Circuit has indicated that the General Accounting Office will not pay any fees prior to

the end of all appellate proceedings. *McDonald,* 726 F.2d 311, 315.

Justice Act perverse weapon for discouraging meritorious fee applications.

*Id.* at 315. By being forced to apply for fees before the government's time to appeal has lapsed claimant's counsel might be faced with the "exquisite dilemma" of whether to forego any fee application and thereby preserve his client's often meager judgment, or jeopardize the client's judgment by applying for fees and thereby giving the government an incentive to appeal. *Id.*

The Seventh Circuit concluded *McDonald* with a suggestion that Congress could clarify matters by amending subsection (d) to read that a fee application must be filed "within thirty days after the judgment in the district court has become final and unappealable, or after the court of appeals or the Supreme Court has entered a final judgment." *Id.* at 315. As we have noted above, *see* Part I *supra,* Congress apparently took *McDonald* to heart and attempted to amend subsection (d) accordingly. Despite the President's veto, the Third Circuit has interpreted Congress' attempt to so amend subsection (d) as an indication of Congress' intent in passing the original statute. *Taylor v. United States,* 749 F.2d 171, 174 (3d Cir.1984). In *Taylor* the Third Circuit held:

Because Congress has now made its intent clear, we hold that 'final judgment' arises and the thirty day cut-off for EAJA petitions begins when the government's right to appeal the order has lapsed.

*Id.* Although we disapprove of the *Taylor* court's method of statutory interpretation, *see* Part I *supra,* its application of the *McDonald* definition of "final judgment" is pertinent to the resolution of this case.

In *Taylor* the plaintiff filed suit in district court seeking his release from military custody and an order restraining the government from surrendering him to Spanish authorities to serve a sentence in Spain. *Id.* at 172. On July 15, 1982, the district court issued the injunction and ordered the plaintiff released. The Third Circuit affirmed the district court's order on

June 21, 1983. On July 21, 1983, the court denied the plaintiff's petition for rehearing and suggestion for rehearing *en banc.* On August 2, 1983, the plaintiff filed his application for fees and expenses in the district court. Finally, on September 2, 1983, the government informed the plaintiff and the district court that it would pursue no further appeal (i.e. writ of certiorari). Under these facts the court paraphrased the *McDonald* definition of timely under subsection (d): "fee petitions under the EAJA must be filed no later than thirty days after the expiration of the time to appeal, or after termination of the litigation by the court of last resort, or after a losing party asserts that no further appeal will be taken." *Id.* at 174. Accordingly, the court held that the plaintiff's fee application was timely as filed within thirty days of September 2, the date upon which the government gave notice that it would not pursue a further appeal. *Id.* at 175. In this case, however, the record is silent as to whether the government ever gave notice that it would not pursue a further appeal, and we must presume that the government gave no such notice.

■ The Seventh Circuit's analysis in *McDonald* and the Third Circuit's analysis in *Taylor* lead inexorably to the conclusion that the appellants' application was timely since it was filed before the Board's right to petition for writ of certiorari lapsed. Pursuant to 28 U.S.C. § 2101(c) and Sup. Ct.R. 20.4 the Board had ninety days from the date this court denied BRAC's suggestion for rehearing within which to petition for a writ of certiorari. This is true even though the Board never filed a petition for rehearing. Sup.Ct.R. 20.4 expressly provides that "if a petition for rehearing is timely filed by any party in the case, the time for filing the petition for writ of certiorari *for all parties (whether or not they requested rehearing or joined in the petition for rehearing)* runs from the date of the denial of rehearing or of the entry of a subsequent judgment entered on the rehearing." (emphasis ours). Accordingly, the appellants' thirty-day time limit for fil-

ing their application for fees under subsection (d) could not begin to run any earlier than ninety days after November 28, 1983, the date on which we denied BRAC's petition for rehearing and suggestion for rehearing *en banc.* The appellants filed their fee application in the district court on February 7, 1984, before the Board's time for petitioning for certiorari had expired and, therefore, before their subsection (d)(1)(B) thirty-day limit even began to run. The application was clearly timely.

Although we are convinced that after a court of appeals' judgment on the merits the subsection (d) thirty-day time limit should not begin to run until the government's time for filing a petition for writ of certiorari has lapsed or the government has given notice that it will not file such a petition, *see Taylor,* 749 F.2d at 175, in order to reach this result we must carefully distinguish *Martin v. Heckler,* 754 F.2d 1262 (5th Cir.1985). In *Martin* another panel of this court entered its decision on the merits on December 17, 1984. The prevailing party then filed his application for attorney's fees under subsection (d) on January 7, 1985. Relying on *McDonald* the court stated that "[w]ithin the meaning of the Act, the 'final judgment' is, in the event of appeal, the judgment of the appellate court." We note first that this statement is ambiguous in that it is impossible to be certain whether the court's reference to "judgment of the appellate court" refers to an appealable or an unappealable judgment, although the court's reliance on *Gold Kist v. U.S. Department of Agriculture,* 741 F.2d 344 (11th Cir.1985)[4] would suggest some variation of the former.[5] Moreover,

since the application in *Martin* would have been timely under either interpretation of "judgment of the appellate court," any implicit distinction made by the court was not vital to the decision and is not binding on us. We also note that in a subsequent case the same panel that decided *Martin* described the holding of *McDonald* as "final judgment occurs when right to appeal order has lapsed." *Clifton v. Heckler,* 755 F.2d 1138, 1145 n. 16 (5th Cir.1985).

The implied holding of *Martin* notwithstanding, that the government's time to petition for certiorari delays the start of the thirty-day period is most consistent with our reading of subsection (d). As the *Taylor* court noted, "[t]his flexible time limit satisfies the demands of finality, and avoids the fragmentation of fee petitions." 749 F.2d at 174. Accordingly, we conclude that the appellants' fee application was timely since it was filed within thirty days of the date on which the Board's right to appeal had lapsed.[6]

### III. Position of the United States

Under subsection (d)(1)(A) of the EAJA a prevailing party is entitled to attorney's fees "unless the court finds that the position of the United States was substantially justified." Unfortunately, "position of the United States" is subject to at least two interpretations: the position the government took in its underlying action and the position the government took in the litigation. In EAJA litigation these two interpretations have become known as the "underlying action" and "litigation position" theories. In this case the district court

---

**4.** The author of this opinion, sitting on the Eleventh Circuit by designation, joined in the *Gold Kist* decision.

**5.** That the *Martin* panel relied on *Gold Kist* would tend to indicate that it intended "judgment of the appellate court" to refer to something other than the unappealable judgment envisioned by the *McDonald* and *Taylor* courts. In *Gold Kist* the Eleventh Circuit stated that "when the non-government party loses in district court but prevails on appeal, it must file its application for fees under the EAJA within 30 days of the judgment of the appellate court." 741 F.2d at 349. The court clarified this to

mean that an application should be filed within 30 days of the district court's order making the judgment of the court of appeals the order of the district court. *Id.* at 350. However, these statements are dicta of the purest kind since no fee application had been filed at the time of the court's decision. *Id.* at 349. In essence, the court was merely giving the potential applicant advice as to when to file its application for fees.

**6.** That Russell's application was, in fact, filed before the 30-day period began does not affect its timeliness. *See McDonald,* 726 F.2d at 315.

held that the Board's position was substantially justified, but did not state to which "position" it referred. Although the distinction is only rarely of any import since the government's litigation position is most often that its underlying action was substantially justified, in a minority of cases the two positions are distinct and it becomes necessary for the court to decide to which the EAJA refers. *Spencer v. NLRB,* 712 F.2d 539, 552 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984). This case is one of that minority.

The Board's litigation position was that since the Railway Labor Act does not provide a mechanism for judicial review of the Board's actions, the district court lacked jurisdiction to consider the case. The Board's underlying action position however, was that it was not required to process Russell's application for investigation of representational dispute where he lacked an intent to serve as representative of the railway police officers. Because the two positions are distinct and at least arguably may not both be substantially justified, we must now address for the first time in this circuit [7] whether "position of the United States" refers to the government's underlying action or its litigation position.

■ Even though we rejected the Board's litigation position on the appellants' prior appeal, the appellants now concede that the position was substantially justified. They argue, however, that we should not allow the Board to avoid paying attorney's fees by relying on a "technical" litigation defense (i.e., lack of jurisdiction) unrelated to the merits of the Board's underlying action, but that we should look to whether the Board's underlying action was substantially justified. Nonetheless, because as discussed below we now join the majority of courts in holding that "the position of the United States" is the government's litigation position, the case is substantively at an end.

The majority of courts that have addressed the issue have adopted the litigation position theory. *See, e.g., Ashburn v. United States,* 740 F.2d 843, 849 (11th Cir. 1984); *Boudin v. Thomas,* 732 F.2d 1107, 1115–16 (2d Cir.1984); *United States v. 2,116 Boxes of Boned Beef,* 726 F.2d 1481, 1486 (10th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984); *Spencer v. NLRB,* 712 F.2d 539, 548–557 (D.C. Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984); *Tyler Business Service, Inc. v. NLRB,* 695 F.2d 73, 75–76 (4th Cir.1982); *Broad Avenue Laundry and Tailoring v. United States,* 693 F.2d 1387, 1390–91 (Fed.Cir.1982). A very few courts have adopted the underlying action theory or some variation thereof. *See, e.g., Iowa Express Distribution, Inc. v. NLRB,* 739 F.2d 1305, 1309 (8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 595, 83 L.Ed.2d 704 (1984) ("position of the United States" includes the government's position at both prelitigation and litigation levels); *Rawlings v. Heckler,* 725 F.2d 1192, 1195 (9th Cir.1984); *Natural Resources Defense Council, Inc. v. EPA,* 703 F.2d 700, 707 (3d Cir.1983). The primary problem the courts have faced is that neither the statute nor its legislative history provides a clear answer to which position Congress intended. *See Ashburn,* 740 F.2d at 843; *Spencer,* 712 F.2d at 539; *Knights of the Ku Klux Klan v. East Baton Rouge,* 679 F.2d 64, 68 (5th Cir.1982).

In the widely followed *Spencer* case the D.C. Circuit recognized this lack of evidence of Congressional intent and, after a brief look at the more or less opaque statute and the ambiguous legislative history,

---

**7.** Most recently in *Houston Agricultural Credit Corp. v. United States,* 736 F.2d 233, 235 (5th Cir.1984), we noted that "this issue is undecided in this circuit." Nevertheless, some courts have interpreted our decision in *S & H Riggers & Erectors, Inc. v. OSHRC,* 672 F.2d 426 (5th Cir. 1982), as adopting the litigation position theory. *See, e.g., United States v. 2,116 Boxes of Boned*

*Beef,* 726 F.2d 1481, 1487 (10th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984); *Natural Resources Defense Council v. EPA,* 703 F.2d 700, 707 (3d Cir.1983). We join the Eleventh Circuit, however, in concluding that *S & H Riggers* did not reach the issue. *Ashburn v. United States,* 740 F.2d 843, 850 n. 6 (11th Cir.1984).

adopted "a practicable definition" of "position of the United States." 712 F.2d at 549.

> We have thus arrived at an impasse; we must acknowledge that Congress failed clearly to resolve the question before us. To answer it, consequently, we must enlarge our field of vision; we must try to discern the underlying purposes of the Act as a whole, and then determine which of the two possible definitions of 'the position of the United States' would best serve those ends.

*Id.* The court then determined that the central objective of subsection 2412(d)(1)(A) was to encourage relatively impecunious parties to challenge unreasonable or oppressive government behavior. It noted, however, that had Congress had only this objective in mind it would have enacted an automatic fee-shifting statute providing for attorney's fees whenever a party prevailed against the government. Congress did not do so, the court reasoned, because it did not wish to inhibit legitimate efforts by the executive branch to enforce the law and because it was concerned by the potentially enormous cost of an automatic fee-shifting provision. Accordingly, in enacting subsection (d)(1)(A) Congress sought the golden mean between the countervailing goals of allowing impecunious parties to challenge unreasonable government action on the one hand and enforcing the law and safeguarding the treasury on the other. In essence the *Spencer* court concluded that whichever definition of "position" more closely approximated that mean in application was the definition Congress had intended.

The court then identified five situations in which the choice of definitions would make a difference: (1) appeals from agency actions under deferential standards of review, (2) standards of liability linked to justification for conduct, (3) defenses unrelated to the merits of the government's behavior, (4) supervening change in the law, and (5) surrender by the government. Analyzing the results of applying the alternate definitions in these situations the court concluded that

> in each of the five situations we can imagine in which the definition of 'the position of the United States' would make a difference, it seems more sensible and consistent with the purposes of the EAJA to interpret the phrase as the stance taken by the United States in litigation than to interpret it as the governmental behavior that precipitated the suit.

*Id.* at 556. In other words, where it makes a difference, applying the litigation position theory best balances the countervailing policy considerations of the EAJA.

This case fits squarely within situations one and three of the D.C. Circuit's five troublesome situations. In situation one, where agency decisions are afforded a deferential standard of review, the application of the underlying action theory would transform the EAJA into an automatic fee-shifting statute. *Id.* at 552. For example, where a reviewing court has just concluded that an agency's underlying action was arbitrary, capricious, and in violation of a clear statutory mandate, it would be hard pressed to say that the action was substantially justified. Moreover, since in this situation a prevailing party will always have overcome such a deferential standard, the government could never lose on the merits and nevertheless avoid attorney's fees. We must suppose that if Congress had intended to write an automatic fee-shifting statute it would have done so.

In the D.C. Circuit's third situation the government asserts a litigation defense that is unrelated to the merits of its underlying behavior. *Id.* at 554. For example, the government might assert the defenses of laches, mootness, lack of standing, or lack of jurisdiction.[8] In examining situation three the *Spencer* court concluded that "tying EAJA awards to the strength of the justification for the government's original action would discourage counsel for the government from asserting defenses un-

---

**8.** A defense of lack of jurisdiction fits both situations one and three since it may, and often does, relate to the merits of the government's behavior, or may be of a purely "technical" nature.

related to its officials' conduct that have a significant chance of prevailing." *Id.* at 555. This is because the government might decide to forego a legitimate "technical" defense and end the litigation rather than risk an attorney's fees award. Clearly, such a result would run counter to the valid policies behind the creation of "technical" defenses and must be viewed as inconsistent with the overall goals of the EAJA.

We find the *Spencer* court's analysis very instructive in this case, and we hereby join the majority of courts in adopting the litigation position theory. Accordingly, for the purposes of subsection (d)(1)(A) of the EAJA we define "the position of the United States" as the position the government took in the litigation.

The appellants contend that adoption of the litigation position theory will effectively immunize the Board from EAJA liability, since, in view of the narrow "window" of judicial review of Board decisions, the Board will always be substantially justified in arguing that the reviewing court lacks jurisdiction. To the extent that this is true, however, we agree with the Board that it is merely the legitimate consequence of applying a substantive rule of law. To find otherwise would be to discourage the government from availing itself of a legitimate defense, presumably created for sound reasons of policy.

The appellants also contend that the recent attempt by Congress to amend the EAJA to adopt the underlying action theory is clear evidence of Congress' intent in the original EAJA. Nevertheless, for the reasons aforementioned, *see* Part I *supra,* we will not accord this postenactment legislative history significant weight in our interpretation of the original EAJA, particularly in light of the persuasive analysis of the *Spencer* court.

Nor are we persuaded by the Eighth Circuit's conclusion in *Iowa Express Distribution, Inc. v. NLRB,* 739 F.2d 1305, 1309 (8th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 595, 83 L.Ed.2d 704 (1984), that "the purpose of the EAJA is best served by interpreting position of the United States

to include the government's position at both the prelitigation and litigation levels." The purpose to which the court referred was to encourage government regulatory agencies to take only actions that have a reasonable basis in law and fact. The court mentioned no other purposes or considerations pertaining to the EAJA. Given this limited view of the Congressional intent in enacting the EAJA, the court's conclusion is logical. Nevertheless, the more enlightened view, as expressed by the *Spencer* court, is that because Congress was forced to seek a mean between a "complex of concerns," any definition of "the position of the United States" must in its application be consistent with that mean, not with any single concern.

Since we have adopted the litigation position theory, and since the appellants concede that the Board's litigation position was substantially justified within the meaning of subsection (d)(1)(A) of the EAJA, we affirm the district court's judgment. Accordingly, we need not address the appellants' contention that the district court abused its discretion in finding that special circumstances would make an award of fees unjust.