T.C. Memo. 1995-564


UNITED STATES TAX COURT


HENRY P. AND DARLENE C. BRANTLEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 10128-94.            Filed November 28, 1995.


<u>William J. Irvin</u> and <u>Stephen Gregory Reardon</u>, for petitioners.

<u>Scott Anderson</u>, <u>John C. Donovan</u>, and <u>Thomas D. Moffitt</u>, for respondent.


MEMORANDUM OPINION

JACOBS, <u>Judge</u>:  This matter is before the Court on petitioners' Motion for Litigation and Administrative Costs pursuant to section 7430 and Rule 231.  All section references are to the Internal Revenue Code in effect for the matter under

consideration, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The substantive issue which gave rise to petitioners' motion involves the 1990 cancellation of a $228,000 note owed by Henry P. Brantley (petitioner) to Elite Coatings Company, Inc. (Elite), and whether such cancellation resulted in discharge of indebtedness income to petitioners pursuant to section 61(a)(12). Respondent conceded this issue when this case was called for trial on March 20, 1995, in Richmond, Virginia.

The parties have submitted affidavits and memoranda supporting their positions. Neither party requested an evidentiary hearing. We decide the matter before us based on petitioners' Motion for Litigation and Administrative Costs, respondent's objection to petitioners' motion, petitioners' response and supplemental response to respondent's objection, respondent's reply to petitioners' response, and the affidavits and exhibits provided by the parties. See Rule 232(a)(3).

Petitioners failed to present the facts surrounding the cancellation of Henry P. Brantley's debt to Elite in a comprehensive manner. Nevertheless, we attempt to succinctly set forth below those pertinent facts (as we understand them) required to resolve the motion before us. In doing so, we have simplified a complex series of events with regard to petitioner's acquisition of Elite stock and the ultimate cancellation of petitioner's debt to Elite in connection with such stock acquisition.

Background

Petitioners Henry P. and Darlene C. Brantley resided in Milledgeville, Georgia, at the time they filed their petition in this case.

Petitioner is a chemical engineer. He was employed at all relevant times by Elite, a Georgia corporation that produced and sold paint and allied products.

In June 1985, petitioner wrote two checks totaling $72,000 (one to Hargis Enterprises, Inc. (H. Enterprises) and the other to Gary W. Hargis) with respect to a "business agreement". Apparently, this "business agreement" related to petitioner's prospective ownership in Elite. At the time the checks were issued, H. Enterprises and Mr. Hargis owned all of the stock of Elite. Mr. Hargis was sole shareholder, president, and director of H. Enterprises.

In the latter part of 1987, petitioner acquired 49 percent of the outstanding stock of Elite. The record does not reveal from whom (H. Enterprises, Mr. Hargis, or Elite) petitioner acquired the stock. Petitioner paid $300,000 for his 49-percent ownership interest. This amount consisted of $72,000 (which he had paid to Mr. Hargis and H. Enterprises in 1985) and a $228,000 promissory note to Elite.

At the time of the acquisition, representations were made to petitioner that Elite's value exceeded $600,000 and that its plant was in good physical condition. These representations proved

false; at the time petitioner acquired the stock, Elite had a negative net worth and its plant was in poor physical condition.

On April 2, 1990, H. Enterprises, Mr. Hargis, Elite, and petitioner entered into an agreement pursuant to which, among other matters, petitioner purchased an additional 2 percent of Elite stock from H. Enterprises. As part of the agreement, Elite forgave all debts owed it by H. Enterprises, Mr. Hargis, and petitioner, including petitioner's $228,000 note to Elite.

Subsequently, on April 19, 1990, Elite redeemed all of its stock owned by H. Enterprises. As a result of this redemption, petitioner owned 100 percent of Elite stock.

Furthermore, on April 19, 1990: (1) H. Enterprises and Mr. Hargis sold to Elite their interest in patents, trademarks, servicemarks, logos, trade names, formulas, and paint formulations; and (2) Mr. Hargis entered into a noncompetition agreement with Elite.

Administrative Proceeding

The examination of petitioners' 1990 Federal income tax return began as an offshoot of an audit of H. Enterprises and Elite. The revenue agent questioned whether petitioners should have reported the cancellation of the $228,000 debt as income on their 1990 return.[1]

---

[1] Gross income includes income from the discharge of indebtedness. Sec. 61(a)(12). A taxpayer may realize discharge of indebtedness income by paying an obligation at less than its

(continued...)

Throughout the administrative proceeding, petitioners maintained that they did not receive income from the cancellation of the $228,000 note. They stated that the revenue agent erred when he determined that the cancellation of petitioner's note to Elite on April 2, 1990, was connected to Elite's redemption of its stock from H. Enterprises on April 19, 1990. Petitioners contended that the cancellation of petitioner's debt to Elite was, in essence, a reduction of the $300,000 purchase price for Elite's stock to reflect Elite's correct value pursuant to section 108(e)(5)[2] or as a setoff for damages because of misrepresentations

---

[1](...continued)
face value. <u>United States v. Kirby Lumber Co.</u>, 284 U.S. 1 (1931). A reduction in debt without a corresponding reduction in assets causes an economic gain and income to the debtor because assets are no longer encumbered. Generally, a cancellation of indebtedness produces income to the debtor in an amount equal to the difference between the amount due on the obligation and the amount paid for the discharge. If no consideration is paid for the discharge, then the entire amount of the debt is in most circumstances considered the amount of income that the debtor must include in income. Sec. 61(a)(12); <u>Babin v. Commissioner</u>, 23 F.3d 1032, 1034 (6th Cir. 1994), affg. T.C. Memo. 1992-673.

[2]     Sec. 108(e)(5) provides:

SEC. 108.  INCOME FROM DISCHARGE OF INDEBTEDNESS.

          *     *     *     *     *     *     *

     (e)  General Rules for Discharge of Indebtedness (Including
          Discharges Not in Title 11 Cases or Insolvency).--For
purposes of this title--

          *     *     *     *     *     *     *

          (5)  Purchase-money debt reduction for solvent debtor
                                        (continued...)

made to petitioner. Alternatively, petitioners argued that petitioner was insolvent at the time the note was discharged, and, as a result, the amount of the discharged indebtedness was not includable in income pursuant to section 108(a)(1)(B).[3]

---

[2](...continued)
treated as price reduction.--If--

    (A) the debt of a purchaser of property to the seller of such property which arose out of the purchase of such property is reduced,

    (B) such reduction does not occur--
        (i)  in a title 11 case, or
        (ii)  when the purchaser is insolvent,
and

    (C) but for this paragraph, such reduction would be treated as income to the purchaser from the discharge of indebtedness,

then such reduction shall be treated as a purchase price adjustment.

Sec. 108(e)(5) was enacted "to eliminate disagreements between the Internal Revenue Service and the debtor as to whether, in a particular case to which the provision applies, the debt reductions should be treated as discharge income or a true price adjustment." S. Rept. 96-1035 (1980), 1980-2 C.B. 620, 628. In order for a reduction in the amount of a debt to be treated as a purchase price adjustment pursuant to sec. 108(e)(5), the following conditions must be met: (1) The debt must be that of a purchaser of property to the seller that arose out of the purchase of such property; (2) the taxpayer must be solvent and not in bankruptcy when the debt reduction occurs; and (3) except for section 108(e)(5), the debt reduction would otherwise have resulted in discharge of indebtedness income. Sec. 108(e)(5); 1 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, pp. 6-40 to 6-41 (2d ed. 1989); Juister v. Commissioner, T.C. Memo. 1987-292, affd. without published opinion 875 F.2d 864 (6th Cir. 1989).

[3]    Gross income does not include discharge of indebtedness income if the discharge occurs when the taxpayer is insolvent.
(continued...)

The revenue agent requested petitioners to produce pertinent information regarding the stock transfer and cancellation of indebtedness, as well as the circumstances surrounding these events. Petitioners failed to do so.

The revenue agent did not possess sufficient facts to understand the 1987 and 1990 transactions that transferred stock ownership of Elite from Mr. Hargis to petitioner. The documentary evidence that the agent possessed indicated that after the two April 1990 transactions, petitioner was the owner of all the outstanding Elite stock and no longer was indebted to Elite.

Because the parties were unable to reach an agreement with respect to the discharge of indebtedness income, respondent issued a notice of deficiency on March 11, 1994. Respondent determined a $70,355 deficiency in petitioners' 1990 Federal income tax and a $14,071 accuracy-related penalty pursuant to section 6662(a).

---

[3](...continued)
Sec. 108(a)(1)(B). The amount of discharge of indebtedness income excluded from gross income may not exceed the amount of the taxpayer's insolvency. Sec. 108(a)(3). A taxpayer is insolvent when his liabilities exceed the fair market value of his assets immediately before the discharge. Sec. 108(d)(3). If an insolvent taxpayer's debt is discharged, no income is realized because the discharge of indebtedness does not make assets available to the debtor. Quinn v. Commissioner, 31 B.T.A. 142, 145 (1934); cf. United States v. Kirby Lumber Co., 284 U.S. 1 (1931). However, a debtor who is insolvent before the discharge realizes income to the extent such discharge renders him solvent. Conestoga Transp. Co. v. Commissioner, 17 T.C. 506, 513 (1951); Texas Gas Distrib. Co. v. Commissioner, 3 T.C. 57, 61-62 (1944).

Judicial Proceeding

Petitioners filed a petition in this Court on June 14, 1994.[4] Their petition reiterated the arguments enunciated during the administrative proceeding.

On June 22, 1994, an attorney in respondent's Richmond, Virginia, office was assigned this case. Respondent's answer, filed on July 22, 1994, denied petitioners' allegations for lack of sufficient information.

On February 1, 1995, respondent's counsel sent a letter to petitioners' counsel summarizing respondent's position that (1) section 108(a)(1)(B) is not applicable because petitioner was not insolvent in April 1990, and (2) the debt forgiveness does not qualify as a section 108(e)(5) purchase price adjustment. In the letter, respondent's counsel asked that the parties begin stipulating facts, and stated that the documents provided by petitioners "present a confusing picture" with regard to petitioner's acquisition of Elite stock.

Petitioners' claim of insolvency at the time the stock was transferred was based on a financial statement petitioners prepared as of April 1990. That statement reflects a negative net worth of $229,700. However, respondent's counsel did not agree with certain aspects of the financial statement: (1) Petitioner's Elite stock is valued at only $100, while the full amount of his $228,000 note to

---

[4] The petition was timely mailed on June 9, 1994. Sec. 7502(a).

Elite is shown as a liability; and (2) petitioner's half-interest in petitioners' residence is listed as an asset, while the full amount of the residential mortgage is shown as a liability. Respondent's counsel contended that an accurate financial statement would show that petitioner was in fact solvent in April 1990 because Elite owned valuable equipment, patents, and real property.[5]

Respondent's counsel was uncertain whether section 108(e)(5) applied because it was not clear from whom petitioner acquired his Elite stock. Petitioners never provided respondent's counsel with Elite's stock record book. Respondent's counsel believed that section 108(e)(5) would apply only if Elite had sold the stock to petitioner. In addition, section 108(e)(5) requires petitioner to have been solvent in April 1990.

Finally, respondent's counsel believed that petitioner acquired all of the Elite stock through a series of agreements in which valuable property and rights to property were transferred to Mr. Hargis and entities that he controlled in exchange for his Elite stock. Petitioners' claim that the Elite stock was worthless was belied by the hard-bargained series of deals.

On February 16, 1995, counsel for petitioners and respondent met to discuss the case. Petitioners' counsel for the first time provided respondent's counsel with factual background to the

---

[5] An Oct. 3, 1989, letter states that Elite was worth approximately $1,250,000.

documents that petitioners had earlier presented. Petitioners' counsel related the following information to respondent's counsel during the meeting.

1. Petitioner is a chemical engineer whose specialty is paint. In 1990 he was employed by Elite, a company that developed, produced, and sold special application paints for bridges, ironwork, and railroad rolling stock. Until 1987, Elite was a wholly owned subsidiary of H. Enterprises.

2. Prior to 1987, petitioner had loaned funds or had not received salary so that Elite essentially owed him $72,000. In 1987, Elite issued petitioner 49 percent of the outstanding stock. In return, petitioner contributed $72,000 to Elite and signed an interest-bearing note for $228,000. Petitioner expected to pay the note with future Elite dividends. However, Elite did not pay dividends because its excess cash was "siphoned off" by Mr. Hargis. As a result of the transfer of stock in 1987, Elite was no longer able to file a consolidated return and began to file its own income tax returns.

3. Through two separate agreements entered into in April 1990, Elite canceled the $228,000 note, and petitioner acquired the remaining outstanding shares of Elite stock. Central to the change in ownership, but not part of the agreements, was a refinancing arrangement whereby the financial backer of the corporation was replaced.

4.     Petitioner was the engineer who ran Elite.  He believed that he could make a profit selling specialty paint.  Mr. Hargis and his various enterprises were "siphoning off" a great deal of Elite's profit.  By 1990, petitioner "wanted out".  Mr. Hargis was financially unstable and was pressured by the financial backer to personally repay Elite's line of credit.  The new financial backer agreed to provide financing for the corporation only if Mr. Hargis was no longer involved in the operation.  The agreements through which petitioner acquired the remaining Elite stock was a way for petitioner to "get rid" of Mr. Hargis by transferring real and personal property Elite owned with a value of approximately $150,000.  Mr. Hargis received the property in return for his remaining interest in a corporation that was not going to survive without new working capital (which was unavailable while he was an owner).  As a result of the presence of the new financial backer, Mr. Hargis was relieved of his personal guarantee of Elite's loans.

5.     In exchange for taking over Elite's debt, the new financial backer received a steady source of a product he needed from a more stable company run and owned by a person he admired and trusted.  The new financial backer believed that petitioner would be required to guarantee the new financial backer's loans to Elite but due to a mistake, petitioner was not asked for his guarantee until after the new financial backer came into the picture. Petitioner then refused to become a guarantor.

Petitioners' counsel informed respondent's counsel that petitioner and the new financial backer would testify to the above facts. Respondent's counsel determined that no one was available to contradict petitioners' position.

Thus, it was at the February 16, 1995, meeting that respondent's counsel "was presented with a logical explanation" for the first time as to why Mr. Hargis "gave" petitioner 51 percent of the Elite stock. Also, on February 24, 1995, petitioners provided respondent with numerous documents.

After considering the explanation offered at the February 1995 meeting and the newly acquired documents, respondent's counsel decided to settle the case by allowing petitioners to treat the cancellation of indebtedness as a purchase-money debt reduction pursuant to section 108(e)(5) so that petitioner's basis in the stock of Elite would be $72,000. Respondent's counsel informed petitioners of the concession on March 13, 1995.

Respondent's counsel settled this case on March 13, 1995, for the following reasons: (1) Petitioners' counsel's explanation of the transactions in February 1995, together with the recently acquired documents, provided a more complete account of the transactions; (2) respondent's counsel did not have any evidence other than the documents to refute petitioners' explanation; (3) it was unclear that the Court would not consider Elite rather than H. Enterprises to be the seller of the stock and apply section 108(e)(5) to treat the cancellation of indebtedness as a reduction

in purchase price; and (4) the "hazards of litigation". Accordingly, when this case was called for trial on March 20, 1995, respondent's counsel informed the Court that a basis for settlement had been reached and that respondent was conceding the case.

On June 8, 1995, petitioners filed a Motion for Litigation and Administrative Costs in the total amount of $19,483.51, and a $60 filing fee.

Discussion

A prevailing party may be awarded a judgment for reasonable litigation costs incurred in connection with a Court proceeding pursuant to section 7430, as amended by the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 6239, 102 Stat. 3342, 3743-3746 (applicable to petitions filed after November 10, 1988). See also Rule 231. The petition in this case was filed on June 14, 1994.

An individual taxpayer must meet seven requirements in order to be awarded reasonable litigation and administrative costs under section 7430. The taxpayer must:

(1) Timely file a motion for litigation and administrative costs. Rule 231(a). Petitioners met this requirement.

(2) Substantially prevail in the proceeding in this Court. Sec. 7430(c)(4)(A)(ii). Respondent concedes that petitioners met this requirement.

(3) Not unreasonably protract the administrative proceeding or the proceeding in this Court. Sec. 7430(b)(4). Respondent concedes that petitioners met this requirement.

(4) Establish that respondent's positions in the administrative proceeding and the proceeding in this Court were not substantially justified in law or in fact. Sec. 7430(c)(4)(A)(i), (7)(A) and (B); Pierce v. Underwood, 487 U.S. 552, 564-565 (1988); Huffman v. Commissioner, 978 F.2d 1139, 1143-1147 (9th Cir. 1992), affg. in part, revg. in part on other grounds, and remanding T.C. Memo. 1991-144; Sliwa v. Commissioner, 839 F.2d 602, 606 (9th Cir. 1988); Powers v. Commissioner, 100 T.C. 457, 470 (1993). As discussed below, we hold that petitioners did not meet this requirement.

(5) Exhaust any administrative remedies available in the IRS.[6] Sec. 7430(b)(1). Respondent concedes that petitioners met this requirement.

(6) Have a net worth that did not exceed $2 million at the time the petition was filed in the case. Sec. 7430(c)(4)(A)(iii); 28 U.S.C. sec. 2412(d)(2)(B) (1988). Respondent concedes that petitioners met this requirement.

(7) Establish that the amount of costs claimed is reasonable. Sec. 7430(a), (c)(1) and (2). Because of our disposition of petitioners' motion, we do not reach this issue.

---

[6] This requirement only applies to a judgment for an award of reasonable litigation costs. Sec. 7430(b)(1).

Petitioners must establish all of the above requirements before the Court may award litigation and administrative costs under section 7430. Minahan v. Commissioner, 88 T.C. 492, 497 (1987); Han v. Commissioner, T.C. Memo. 1993-386. Petitioners have the burden of proof with respect to each and every requirement. Rule 232(e); Welch v. Helvering, 290 U.S. 111, 115 (1933); Gantner v. Commissioner, 92 T.C. 192, 197 (1989), affd. 905 F.2d 241 (8th Cir. 1990).

The "not substantially justified" standard under section 7430 is applied as of the separate dates that respondent took positions in the administrative proceeding and the proceeding in this Court. Sec. 7430(c)(7)(A) and (B); Huffman v. Commissioner, supra; Han v. Commissioner, supra. For purposes of the administrative proceeding, respondent took a position on March 11, 1994, the date of the notice of deficiency. Sec. 7430(c)(7)(B). For purposes of the proceeding in this Court, respondent took a position on July 22, 1994, the date respondent filed the answer. See Huffman v. Commissioner, supra at 1148. These two positions are virtually identical; there is no evidence in the record that respondent's position changed from the time she issued the notice of deficiency until after the February 1995 meeting when petitioners provided respondent with pertinent facts surrounding the transactions. Whether or not this position was substantially justified will determine whether petitioners are entitled to an award of reasonable litigation and administrative costs.

In 1986, Congress changed the language describing the position of the United States from "unreasonable" to "not substantially justified", the standard applicable to the Equal Access to Justice Act, 28 U.S.C. sec. 2412 (1988). Tax Reform Act of 1986, Pub. L. 99-514, sec. 1551, 100 Stat. 2752; H. Conf. Rept. 99-841, at II-801 (1986), 1986-3 C.B. (Vol. 4) 801. This Court has held that the substantially justified standard does not represent a departure from the reasonableness standard. Sher v. Commissioner, 89 T.C. 79, 84 (1987), affd. 861 F.2d 131 (5th Cir. 1988), and cases cited therein; see also Pierce v. Underwood, supra at 563-565.

"Substantially justified" means "justified to a degree that could satisfy a reasonable person" both as a matter of fact and law. Pierce v. Underwood, supra at 565. That interpretation also applies to motions for litigation costs under section 7430. William L. Comer Family Equity Pure Trust v. Commissioner, 958 F.2d 136, 139-140 (6th Cir. 1992), affg. per curiam T.C. Memo. 1990-316; Norgaard v. Commissioner, 939 F.2d 874, 881 (9th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1989-390. For a position to be substantially justified, there must be "substantial evidence" to support it. Pierce v. Underwood, supra at 564-565. In deciding whether the Commissioner's position was substantially justified, the Court will consider not only the basis of the Commissioner's legal position, but also the manner in which the Commissioner maintained that position. Wasie v. Commissioner, 86 T.C. 962, 969 (1986).

Respondent argues that her administrative and judicial position regarding petitioner's 1990 discharge of indebtedness was substantially justified. Petitioners disagree.

With regard to the administrative proceeding, the revenue agent encountered several significant factual inconsistencies. Petitioners bore the burden of establishing that the section 108(a)(1)(B) or (e)(5) exception applied. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111 (1933). Because it was unclear whether petitioner was insolvent at the time the debt was canceled, it was impossible to determine whether section 108(a)(1)(B) applied. Neither were there sufficient facts to establish that section 108(e)(5) applied. If petitioner was solvent, there was no evidence that the reduced debt was the debt "of a purchaser of property to the seller of such property". Sec. 108(e)(5).

In effect, petitioners acted as if the burden of establishing the facts of the case were on respondent. It is not unreasonable for the Commissioner to require a taxpayer to corroborate its claims regarding a dispositive and unresolved fact. <u>Baker v. Commissioner</u>, 83 T.C. 822, 830 (1984), vacated and remanded on another issue 787 F.2d 637 (D.C. Cir. 1986); <u>Fallin v. Commissioner</u>, T.C. Memo. 1993-332; <u>Caparaso v. Commissioner</u>, T.C. Memo. 1993-255. The Commissioner was not required to concede this case before she received the requested documentation necessary to prove petitioners' contentions. See <u>Brice v. Commissioner</u>, T.C. Memo. 1990-355, affd. without published opinion 940 F.2d 667 (9th

Cir. 1991). In sum, we hold that respondent's position in the administrative proceeding, i.e., issuance of the notice of deficiency, was substantially justified.

Respondent's position in the judicial proceeding also was substantially justified. As of the date she filed the answer (July 22, 1994), respondent had not received any further information from petitioners. It was reasonable for respondent's answer to reassert the position taken in the notice of deficiency. Petitioners had to prove that the discharge of indebtedness did not create gross income. Rule 142(a). However, as of July 22, 1994, they had not developed the facts necessary to show that either section 108(a)(1)(B) or (e)(5) applied. It was not until February 1995 that petitioners more fully presented their case. At that time, respondent's counsel reevaluated the case, weighing the evidence presented as well as the costs of litigation. After reviewing the additional information offered by petitioners, respondent's counsel expeditiously conceded the case. Having considered all the evidence before us, we hold that there was sufficient doubt as to the applicability of the mutually exclusive section 108(a)(1)(B) and (e)(5) to substantially justify the position taken by respondent in both the notice of deficiency and the answer. Petitioners have failed to prove that respondent's position was not substantially justified.

The fact that the Commissioner eventually loses or concedes a case is not sufficient to establish that a position is not

-19-

substantially justified. <u>Sokol v. Commissioner</u>, 92 T.C. 760, 767 (1989). To rule otherwise would "not only distort the truth but penalize and thereby discourage useful settlements." <u>Pierce v. Underwood</u>, <u>supra</u> at 568. The reasonableness of the Commissioner's position necessarily requires considering what the Commissioner knew at the time. Cf. <u>Rutana v. Commissioner</u>, 88 T.C. 1329, 1334 (1987); <u>DeVenney v. Commissioner</u>, 85 T.C. 927, 930 (1985).

Respondent's position was reasonable in light of the issue presented and the information that was available to her during the administrative and judicial proceedings. See, e.g., <u>Harrison v. Commissioner</u>, 854 F.2d 263 (7th Cir. 1988)(concession approximately 6 months after answer filed, after respondent had an opportunity to verify information, held reasonable), affg. T.C. Memo. 1987-52; <u>Wickert v. Commissioner</u>, 842 F.2d 1005 (8th Cir. 1988) (concession 10 days after filing of answer, although it took several months to draft the stipulation of settlement, held to be reasonable), affg. T.C. Memo. 1986-277; <u>Ashburn v. United States</u>, 740 F.2d 843 (11th Cir. 1984)(11-month delay in conceding case not unreasonable because the issues were not simple); <u>White v. United States</u>, 740 F.2d 836, 842 (11th Cir. 1984)(concession of issue 3 months after issue raised was reasonable).

In conclusion, we hold that respondent's administrative and judicial position was substantially justified; i.e., respondent's position had a reasonable basis in both fact and law.

Consequently, we will deny petitioners' Motion for Litigation and Administrative Costs pursuant to section 7430 and Rule 231.

To reflect the foregoing,

<u>An appropriate order</u>

<u>and decision will be entered</u>.