**In re Mark Tarron PARKER, Lisa White Parker, Debtors.**

No. 97–14536.

United States Bankruptcy Court, S.D. Alabama.

March 15, 2002.

---

**3.** This Court, however, would note that Debtor could have sought notice and hearing on a shortened basis.

C. Michael Smith, Mobile, Alabama, for Debtor.

Charles Baer, Mobile, Alabama, Assistant United States Attorney.

### ORDER GRANTING IN PART DEBTORS' MOTION FOR DAMAGES FOR VIOLATION OF STAY

MARGARET A. MAHONEY, Chief Judge.

This matter is before the Court on Debtors' motion against the United States for violation of the automatic stay. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court has the authority to enter a final order. For the reasons indicated below, the Court is granting in part the motion of the debtors for damages for violation of the stay.

## FACTS

Mark and Lisa Parker filed a chapter 13 bankruptcy case on December 17, 1997. The Parkers amended plan was confirmed on March 26, 1998. The plan provided for the claim of the Internal Revenue Service ("IRS") to be paid in full. In April of 1998, the IRS filed a proof of claim in the Parkers' case that included a priority claim in the amount of $2,252.20 for unpaid FICA withholding taxes and an unsecured nonpriority claim in the amount of $2,272.25 for penalties. The claim filed was for the corporate tax debt of South Alabama Concrete Finishers, debt of the Parkers as "responsible persons" for the corporate debt.[1] This occurred when debtors' counsel told the IRS that a claim should be filed by the IRS for the Parkers' debt. An inexperienced IRS employee interpreted this request literally and filed a claim for the corporate taxes. This is not normal IRS procedure because the corporate debt is not a liability of the individual shareholders or officers. The total amount claimed of $4,524.35 was to be paid in full through the plan, and the total amount is listed on the chapter 13 records as a priority claim. The identifying tax numbers listed on the proof of claim attachments were the social security numbers of Mr. and Mrs. Parker *and* the tax identification number of South Alabama Concrete Finishers, Inc.

Once a bankruptcy case is filed, the IRS freezes all activity against a debtor except as appropriate in the bankruptcy case. In this case, the same inexperienced IRS employee put a freeze of all collection activity on the corporate debt, but not the individual debt of the Parkers which should have been the case. Therefore, at least initially, the IRS did not have the proper coding in effect to reflect that the debtors were in bankruptcy and responsible person or trust fund tax claims against the Parkers were stayed.

In April 1998, Lisa Parker received a letter stating that South Alabama Concrete Finishers owed federal taxes that the IRS has been unable to collect, "so we plan to assess a penalty against you." Subsequently, Mark and Lisa Parker each received a notice from the IRS dated September 21, 1998 stating that it was a final notice of the intent of the IRS to levy. On December 28, 1998, the IRS issued a levy to United Bank of Atmore against an account on which the Debtors were listed as custodians. The account belonged to the debtors' two minor daughters. United Bank of Atmore issued a check to the IRS in the amount of $738.66. After debtors brought an action in this Court for violation of the stay, a consent judgment was entered against the IRS on February 4, 1999 requiring the IRS to pay debtors $1,000 plus attorneys fees and costs.

On January 6, 1999, this Court granted the debtors' motion to sell certain property. Upon the sale of the property, the Parkers sent the proceeds to the chapter 13 trustee asking that it be applied to the IRS' claim. In July of 1999, the IRS claim of South Alabama Concrete Finishers was paid in full. The claims for penalties against Mark and Lisa Parker were not paid.[2]

---

1. The Internal Revenue Code permits the IRS to collect unpaid trust fund taxes (e.g., employee's withheld taxes, FUTA and FICA taxes) directly from the personal assets of the persons responsible for collecting and paying the corporate taxes from the corporate assets. 26 U.S.C. § 6672. The payment is a penalty tax, not the tax itself. The tax itself can still be collected from the business.

2. Even though the corporate tax claim was paid in full, that payment does not wipe out the entirely separate trust fund penalty claim against the Parkers. It is a debt generally in the same amount as the corporate trust fund

In 2000, the Parkers attempted to get a tax refund anticipation loan from Bank One for their 1999 tax refund, but were denied such a loan. It was the Parkers' understanding from communications with the bank that their loan was denied because of a debt to the IRS. The only IRS debt that the Parkers had was the claim related to South Alabama Concrete Finishers which they believed was paid in full. The Parkers contacted their attorney about the problem and their attorney contacted by letter an Assistant United States Attorney to attempt to resolve the matter. According to debtors, they needed the money to take care of their regular monthly expenses. Mr. Parker's work decreases November though the beginning of February because of the holidays and the weather. As a result his income decreases as well. The Parkers did ultimately receive the tax refund. An employee for the IRS testified that according to its records the Parkers' IRS account was not frozen at that time and the refund was processed in the normal course.

The IRS sent Mrs. Parker a notice, dated November 28, 2000 stating that it was a "Final Notice—Notice of Intent to Levy and Notice of Your Right to a Hearing Please Respond Immediately." The notice noted Mrs. Parker's social security number as the identifying tax number and stated that she had not paid her federal tax. The notice stated that if she did not pay the $4,185.42 owed or make arrangements to pay the amount, or request an appeal, the IRS might levy on her property. She did not respond to this inquiry.

In 2001, the Parkers again applied for a refund anticipation loan and were again

refused. The same reasons were given by the bank for denial. The Parkers contacted their attorney and the refund was issued to the Parkers. The IRS agent testified that the refund was issued as soon as the return was processed and that the IRS did not freeze the account or hold back the Parkers' refund.[3]

The Parkers received another letter from the IRS dated April 30, 2001. The letter stated that:

> We have no record that you responded to our previous notices. As a result, your account has been assigned to this office for enforcement action, which could include seizing your wages or property.

The letter again used Mrs. Parker's social security number as the identifying tax number and it listed the account balance at $4,335.32.

In May 2001, the IRS served a wage levy on Mrs. Parker's former employer. Mr. and Mrs. Parker were unaware of the levy until their attorney informed them of it. Since Mrs. Parker no longer worked at that place of business, there were no wages to levy. However, Mrs. Parker testified that it still upset her. She still has friends at her former place of work and it was very embarrassing. Mrs. Parker was fearful that the IRS might "get it right" next time and levy a current employer or bank account.

IRS employees testified that the record keeping policies of the IRS have changed over the past several years. There was some confusion as to the status of the debtors' accounts at different periods dur-

---

debt, but is still due as a penalty for failure to timely pay corporate taxes. 26 U.S.C. § 6672.

**3.** The debtors again were denied a tax refund anticipation loan in February 2002 after the

conclusion of this hearing. *See* Debtor's Motion to Supplement the Record. The Court is not taking this evidence into account for purposes of this ruling and the motion to supplement is denied.

ing the pendency of their bankruptcy case. Part of the confusion had to do with the fact that the debtors' company, South Alabama Concrete Finishers, Inc., which is no longer operating, was the basis for the tax debt claimed by the IRS and paid in full through the debtor's personal bankruptcy. At least initially, the IRS did not include an indicator that the Parkers were in bankruptcy on the Parkers' personal account.

The IRS maintains that the Parkers have no reason to fear that their wages or accounts will be levied again or that their tax refunds will be held or delayed by the IRS because a freeze code has been applied to the accounts.[4] However, the records of the IRS still do not show that the Parkers' taxes have been paid in full. The IRS records show that as late as January of 2002 the balance owed by the Parkers is $3,459.53. The IRS employee testified that its policy is that when a person is in bankruptcy his or her account is not shown as paid until that person receives his discharge. The Parkers have not yet received their discharges.

The Parkers testified that the contacts and levies and the perceived delay in receiving their refunds have upset them greatly. Both Mr. and Mrs. Parker have had many sleepless nights worrying about the IRS. Mrs. Parker sometimes took Tylenol PM to try to sleep. Each time they received a communication from the IRS they would call their attorney and fax him the letter or notice. Even after talking with their attorney they would still be upset. Each time their refund anticipation loan was denied they became upset and worried about whether they would actually receive the refund. They needed the refund money to pay expenses. The Parkers were afraid to go to their mailbox to pick up their mail because it might contain another notice from the IRS. The added stress and the sleepless nights affected the entire family. Mr. and Mrs. Parker have three children. The Parkers came close to a divorce. Mr. Parker thought Mrs. Parker was lying about having taken care of the IRS debt because they kept receiving notices. Mrs. Parker's work was also affected because she became irritable. Mrs. Parker did not seek medical treatment from a doctor. She stated that this was because she could not afford to pay a co-pay for each doctor visit. Mr. Parker already had a medical condition and the Parkers felt that it was more important to pay for his visits than for hers.

Mr. Parker has suffered from hypertension and high blood pressure for over twenty years. He testified that because of the emotional stress caused by the IRS his medical condition worsened and he had to change medicines to keep his blood pressure under control. Before the IRS contacts, he had not seen the doctor concerning his blood pressure for years. He checked his blood pressure regularly at home and was able to get refills on his medication without visiting the doctor. He said that because of the IRS contacts he had to make six visits to the doctor before he was able to get his blood pressure completely regulated again. His insurance co-pay is $25 per visit. Mr. Parker's medical records show that he did make several visits to the doctor during the time in question. The records also show that the purpose of the visits was to get his blood pressure under control and to deal with other ailments. For instance, the first visit was for the treatment of a cold or sinus infection. The doctor's notations say that, by Mr. Parker's account, he has excellent control of his hypertension, although only "fair control by ours." The

4. *See* footnote 3 which casts some doubt on this assertion.

notes further state that the reason for the change in medication is because of some side effects with his medication. Mr. Parker had complained of fatigue. Mr. Parker returned to the doctor several times. Mr. Parker continued to complain of fatigue and also sought medical attention for pain in his elbow and to obtain a prescription for Viagra. He spent $150 on doctor visits and $428.46 on prescriptions.

The Parkers had to make one trip to their attorney's office for discovery purposes and one trip to the courthouse for the hearing on the matter. Each of those trips were approximately 136 miles round-trip. Compensation for 272 miles of travel at federal government travel reimbursements rates would be $99.28. They spent about $35 in phone calls and postage on letters to their attorney because of the IRS' actions.

The Parkers still have sleepless nights and worry that they will continue to receive notices and levies from the IRS in the future. They are concerned that it will never end.[5]

### LAW

The Parkers seek damages and attorneys fees for the stay violations they assert the IRS has committed. The Parkers argue that besides actual out-of-pocket costs, the Parkers should be paid $25 per day as damage for their mental anguish and emotional distress ($10 per day for Ms. Parker and $15 per day for Mr. Parker) from November 28, 2000 (the date of the Notice of Intent to Levy) until the day the IRS purges itself of contempt.

■ This case can be broken into four main issues.

1. Did the IRS violate the stay?
2. Was the violation "willful"?

3. Did the Parkers suffer any compensable damages and, if so, how much?

4. Can the Parkers' counsel be paid his attorneys fees?

The debtors bear the burden of proof as to each issue. *In re Sammon*, 253 B.R. 672 (Bankr.D.S.C.2000); *Lamar v. Mitsubishi Motors Credit of America (In re Lamar)*, 249 B.R. 822 (Bankr.S.D.Ga.2000). The Court will address each issue in turn.

### 1.

*Did the IRS violate the Parkers' stay?*

The automatic stay goes into effect at the filing of a debtor's case and continues until discharge. 11 U.S.C. § 362(c)(2). The Parkers filed their case on December 17, 1997. They have not yet received a discharge. All of the IRS's actions that the Parkers contend are stay violations occurred well after filing of this case. Therefore they are violations of the stay unless an exception under 11 U.S.C. § 362(b) applies.

The Parkers assert that five actions of the IRS were stay violations. The IRS concedes that the November 28, 2000 Notice of Intent to Levy, the April 30, 2001 letter and the wage levy of May 2001 were violations. The parties dispute whether the IRS violated the stay in regard to the 1999 and 2000 tax refunds and whether the continued posting in the IRS records of an unpaid trust fund penalty tax of the Parkers was a violation of the stay because the posting prevented the Parkers from receiving a tax refund anticipation loan.

■ The Notice of Levy, April 30, 2001 letter and wage levy in May 2001 clearly violated the stay. These actions were all efforts to recover a prepetition tax claim. 11 U.S.C. § 362(a)(6).

---

**5.** *See* footnote 3.

■ As to the 1999 and 2000 tax re-funds, the evidence showed that no hold was placed on the Parkers tax refunds by the IRS and the refunds were issued in the customary time and manner. The IRS did not violate the stay in its treatment of the refunds.

The tax refund anticipation loan denials are more difficult. The IRS did not ac-tively participate in any denial of the loans. Did the IRS's continued posting of the individual tax debt as unpaid cause a deni-al of the loans? The evidence indicated that it did. The anticipation loans were denied because of an unpaid government debt. The civil penalty debt was the only debt to the United States that the Parkers had. Did the continued posting violate the stay? The Court concludes it did not. First, both sides were operating under a mistaken belief. The debtors and their counsel believed the individual debt was being paid. The IRS employee believed that the Parkers wanted the corporate debt paid through the plan. The proof of claim listed the Parker's social security numbers and the corporate employer iden-tification number so it was unclear. Based on mutual mistake, the proof of claim was filed for the corporate debt. Therefore, it was correct for the IRS to leave the indi-vidual tax debt pending. The IRS did not act inappropriately based on the claim it filed. There was no violation of the stay in the IRS actions. The listing of an unpaid debt was not an attempt to collect the debt or an attempt to obtain property of the estate or exercise control over property of the estate. The IRS did not try to keep the tax refund or prevent a loan to the Parkers. The tax record merely stated the truth as the mistaken record stood.

■ The initial filing of the proof of claim—admittedly incorrectly when based on what the Parkers and their counsel really wanted and based upon what normal procedures would be—was not a stay viola-tion either. Filing a proof of claim in a bankruptcy case is not wrong unless it is fraudulent. 18 U.S.C. § 157.

The Court concludes that when there was a genuine mutual mistake, a mistake either side could have discovered and cor-rected at some point during the case be-fore the tax refund anticipation loan deni-als occurred, the mistake will not be held against one party or the other. The debt-ors did not prove the mistake was solely the fault of the IRS.

2.

*Was the Violation Willful?*

■ A violation of the stay is willful if the creditor knows of the bankruptcy fil-ing. *In re Rainwater*, 233 B.R. 126, 156 (Bankr.N.D.Ala.1999) (citing numerous other cases). The creditor's actions do not have to be intentionally meant to violate the stay. In this case, the IRS clearly knew of the bankruptcy filing. It had already had one judgment against it for $1,000 and attorneys fees for stay viola-tion.

■ Therefore, as to the Notice of Levy, April 30, 2001 letter and May 2001 levy, the IRS's actions were willful. The fact that one employee or one unit of the IRS did not know of the Parkers' bank-ruptcy and continued its collection activi-ties does not change the result.

■ As to the tax refund anticipation loan denials matter, even if the Court's conclusion that the IRS's continued post-ing of the debt was a violation of the stay is incorrect, the Court also concludes that it was not a willful violation. The IRS did not intend that its posting would affect the Parkers' tax anticipation loan status. The

IRS had no notice of this result.[6] Nor could it necessarily have foreseen it. Banks obtain information about taxes owing without any direct contact with the IRS. At least none was shown in this case. At stated, the entire situation was the result of a mistake, not a willful act.

### 3.
### *Did the Parkers Suffer Any Damage?*

■ The Parkers allege out of pocket expenses—telephone, tax and mileage—of $35 and $93.84. These expenses are reasonable and clearly result from the IRS actions. The Parkers needed to bring this issue to their attorney's attention.

The Parkers allege that $428.46 in pharmaceutical expenses and $150 in doctor visit costs were a result of the IRS actions. First, the Viagra, Vantin and Celebrex prescriptions were not proven to be a result of the stay violation issues.[7]

The prescriptions for blood pressure medication commenced November 28, 2000 and continued through November 19, 2001. Mr. Parker did go to the doctor six times from August 30, 2000 through September 19, 2001, and had not been there for years before—at least for blood pressure problems. His testimony and his wife's are the only testimony about the fact that the IRS problems caused a change in his condition. However, the change in prescription does lend credibility to the Parkers' testimony. The Court concludes that the timing of Mr. Parker's drug change and his need to see a doctor about his blood pressure right at the time of the IRS actions is sufficient to

establish liability for some costs. However, at least one-half of the cost of the doctor visits should be disallowed since Parker was treated for other problems as well. Only $75 is allowed. Since Parker already took blood pressure medication, the only damage is the added cost of the new blood pressure medication. He paid $10 for 100 or 10¢ per pill for his prior medication. He paid $138.46 for 210 pills or 66¢ per pill. Therefore he suffered damage of $117.60.

■ The last item of damages sought is damages for Mr. and Mrs. Parker's general stress, sleeplessness and marital discord due to the problems with the IRS. As stated in the *Bryant* case, emotional distress damages are not compensated under recent case law. *In re Lisa J. Bryant,* Order Denying the Motion of the United States for Relief from Judgment and Denying the Motion of Debtor for Violation of the Automatic Stay, —— B.R. ——, Cases No. 01–14104 and 98–14392, 2002 WL 1404758 (Bankr.S.D.Ala. January 28, 2002); *Aiello v. Providian Financial Corp.,* 239 F.3d 876, 880 (7th Cir.2001); *In re Taylor,* 263 B.R. 139 (N.D.Ala.2001). The courts have not awarded emotional distress damages when the injuries have no medical evidence to support them. Ms. Parker has no medical evidence to support her claim. The Court understands her obvious concern about the IRS actions, but, without physical evidence, or an actual taking of her property, the emotional trauma is not compensable. Compensation for contacts with her attorney that hopefully allayed

---

**6.** Debtors' counsel's letter of February 18, 2000 asks the Assistant United States Attorney for assistance with "my clients' income tax refund for the tax year 1999 ... my clients ... have received notice from the Internal Revenue Service that their refund is being withheld due to unpaid taxes." (Debtors' Exhibit 15.)

**7.** There are several other drug prescriptions noted on the debtors' Exhibits 20 and 21. The connection to this case was not explained to the Court and they were not listed in the doctor's notes as drugs he prescribed for Mr. Parker. No award is made for them.

her fears is the only damage the Court can award.

Mr. Parker had medical evidence of blood pressure problems. However, he indicated that the medicine, for which he is being compensated, brought the problem under control. The remainder of the claims, like Ms. Parker's, are too general and unsubstantiated to compensate. Therefore, although the debtors surely were upset by the IRS actions, the Court concludes it cannot compensate them.

■ The debtors seek damages of $10 and $15 per day from November 28, 2000 until the stay violation is cured. Stay violation judgments are like contempt citations in that a court is determining that a party has violated a court order. In the case of a § 362(h) motion, the order violated is the automatic stay. Section 106(a)(3) precludes assessment of punitive damages in actions against the United States under 11 U.S.C. § 362(h). The debtors' request, although styled as compensatory, to this Court appears to include punitive elements as well. The request is at least in part coercive rather than compensatory in nature.

The Court concludes that the evidence did not show Ms. Parker had any compensable injury from the stay violations under the *Aiello* standard. *Id.* Mr. Parker's injury was his elevated blood pressure which within six weeks was under control. Therefore, ongoing damages, were not shown.

### 4.

### *Can the Parkers' Counsel Be Paid His Attorneys Fees?*

■ The final issue is whether the Parkers' counsel should be awarded attorneys fees as allowed under 11 U.S.C. § 362(h). The Parkers' counsel clearly spent considerable time and effort on this case attempting to resolve these issues. The

time was reasonably necessary and certainly worth more than $125 per hour if paid at market rates. Parkers' counsel frankly deserves to be compensated when looking at the equities of the situation. However, this Court does not have "a roving commission to do equity." *Bessette v. Avco Financial Services, Inc.,* 230 F.3d 439, 444 (1st Cir.2000) (quoting *Chiasson v. J. Louis Matherne & Assocs.,* 4 F.3d 1329, 1334 (5th Cir.1993)). The Court must follow the applicable statutes and case law on this subject.

■ The starting point is § 362(h) of the Bankruptcy Code. It allows a debtor to recover attorneys fees if the stay has been violated by a creditor in a debtor's case. Section 106(a)(3) requires that any fees awarded to a debtor under the Bankruptcy Code against a government unit "shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28." As stated in *Matthews v. U.S. (In re Matthews),* 184 B.R. 594 (Bankr.S.D.Ala.1995), this Court has concluded that the fees must be payable pursuant to 26 U.S.C. § 7430. *In re Abernathy,* 150 B.R. 688 (Bankr.N.D.Ill.1993) sets forth the requirements for an award: (1) the debtors must be a prevailing party in a tax case; (2) the proceeding must be an administrative or court proceeding; (3) the action is brought by or against the United States in connection with collection of any tax; and (4) the United States was substantially unjustified in its position.

■ Requirements 1 through 3 are easily met by the Parkers. The Parkers are the prevailing parties because the Court concludes that the IRS did violate the stay which is the most significant issue in the case. 26 U.S.C. § 7430(c)(4)(A)(i)(II). The IRS argued that damages were the most significant part of the case, and, since the Parkers have been awarded only a small sum, that

should preclude recovery as a prevailing party. The IRS did not admit that it violated the stay until trial to the Court's knowledge. The issue of stay violation was most significant and therefore the Parkers are the prevailing party. This motion is a court proceeding that the Parkers brought to preclude collection of a tax so requirements 2 and 3 are also met.

■ Requirement 4—Was the IRS substantially unjustified in its position?—requires more discussion. However, there is a threshold requirement that must be met as to any attorneys fee claim before reaching the justification issue.

As an initial limitation on recovery, a debtor can only recover if he has exhausted his administrative remedies as to that proceeding. 26 U.S.C. § 7430(b)(1). As to the Notice of Levy, an administrative procedure is available as set forth in 26 U.S.C. § 6330(b). The right to a hearing was set forth in the notice. (Debtors' Exhibit 1.) The Parkers did not avail themselves of this right. Therefore, as to the Notice of Levy of November 28, 2000 and the levy itself in May 2001, no fees can be paid.[8] All administrative procedures were not exhausted.

As to the Notices of Taxes Due dated April 30, 2001, no administrative procedure applied. There were no administrative procedures to exhaust. *Matthews, supra.*

Therefore, as to the April 30, 2001 letter, the Court must determine whether the IRS's position was substantially justified. The Court must view the IRS's position only as to the government's in-court litigating position, not the IRS's position before the filing of the Parkers' motion. *Ewing and Thomas, P.A. v. Heye,* 803 F.2d 613 (11th Cir.1986); *Ashburn v. U.S.,* 740 F.2d 843 (11th Cir.1984); *Matthews, supra* at 602.

The Court concludes that the United States' position was substantially justified. The United States conceded that the notice violated the stay but properly contested the damages claim based upon the case law. *E.g., In re Bryant, supra; Aiello, supra.* Therefore, since the United States' position on the one notice for which fees can be claimed is substantially justified, no fees can be awarded.

The IRS is unlike most other creditors. It has a very high "firewall" built around it against imposition of damages of any kind under 11 U.S.C. § 362(h). This case is a perfect example. The IRS made a mistake—several in fact—but attorneys fees may not be awarded for finding and putting a stop to those mistakes.

IT IS ORDERED:

1. The motion of the debtors for damages for the United States' violation of the stay is GRANTED in part and DENIED in part.

2. Damages of $321.44 are awarded to Mark and Lisa Parker from the United States.

---

**8.** The *Matthews* case, *supra,* also involved a levy notice and levy against the debtors. The Court held that administrative proceedings had been exhausted even though the debtors had not complied with 26 U.S.C. § 6330.

This is because § 6330 did not exist until 1998 when it was added to the Internal Revenue Code (in part the Court suspects) to provide another barrier to fees in § 362(h) cases against the government.